UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------x

G-MAX MANAGEMENT, INC., 1139
LONGFELLOW, LLC, GREEN VALLEY
REALTY, LLC, 66 EAST 190 LLC, 4250
VAN CORTLANDT PARK EAST
ASSOCIATES, LLC, 181 W. TREMONT
ASSOCIATES, LLC, 2114 HAVILAND
ASSOCIATES, LLC, SILJAY HOLDING
LLC, 125 HOLDING LLC, JANE ORDWAY,
DEXTER GUERRIERI, BROOKLYN 637-
240 LLC, and 447-9 16TH LLC,

              Plaintiffs,

      -against-

STATE OF NEW YORK, LETITIA JAMES,
in her official capacity as Attorney General of
the State of New York, RUTHANNE
VISNAUSKAS, in her official capacity as
Commissioner of the New York State Division
of Housing and Community Renewal,
WOODY PASCAL, in his official capacity as
Deputy Commissioner of the New York State
Division of Housing and Community Renewal,
CITY OF NEW YORK, COUNTY OF
WESTCHESTER, and CITY OF YONKERS,

              Defendants.

----------------------------------------------------------x

No. 20-cv-___634___

**COMPLAINT**

**JURY TRIAL DEMANDED**

      Plaintiffs G-Max Management, Inc., 1139 Longfellow, LLC, Green Valley Realty, LLC,

66 East 190 LLC, 4250 Van Cortlandt Park East Associates, LLC, 181 W. Tremont Associates,

LLC, 2114 Haviland Associates, LLC, Siljay Holding LLC, 125 Holding LLC, Jane Ordway,

Dexter Guerrieri, Brooklyn 637-240 LLC, and 447-9 16th LLC (collectively, "Plaintiffs"), by

and through their attorneys, Gibson, Dunn & Crutcher LLP, allege for their complaint against

defendants the State of New York (the "State"), Letitia James, in her official capacity as

Attorney General of the State of New York (the "AG"), RuthAnne Visnauskas, in her official

capacity as Commissioner of the New York State Division of Housing and Community Renewal

("DHCR"), Woody Pascal, in his official capacity as Deputy Commissioner of DHCR, the City

of New York (the "City"), the County of Westchester ("Westchester"), and the City of Yonkers

("Yonkers") (collectively, "Defendants"), as follows:

## **NATURE OF THE ACTION**

1.      This case challenges the constitutionality of New York State's new rent-

regulation law—the Housing Stability and Tenant Protection Act of 2019 (Chapter 36 of the

Laws of 2019) (the "HSTPA").  This new statutory regime, unprecedented in both scope and

substance, has transformed the prior, nominally "temporary" rent control and stabilization

system—under which owners agreed to purchase and renovate regulated properties with the

reasonable expectation (tied to express statutory language) that over time they would be able to

raise the rents at statutorily mandated amounts and eventually take properties off rent

regulation—into a draconian regime that permanently re-purposes vast swaths of private

property without compensation in the name of "affordable housing."  The new law will,

moreover, inevitably and irrationally *decrease* the availability of affordable housing and degrade

the quality of the existing rent-regulated housing stock in New York, rendering it economically

infeasible for property owners to maintain such rental properties or develop new low-income

rental housing.

2.      The HSTPA is unconstitutional in so many material ways that it cannot be saved

and should instead be stricken in its entirety.  For example, this new statute:

- Repeals the income cap, transforming a law ostensibly aimed at providing affordable housing to low-income New Yorkers into one that will allow affluent tenants (and their family members, as broadly defined) to benefit indefinitely from the regime;

2

- Repeals provisions that allowed units to be removed from rent regulation once the rent crossed a statutory high-rent threshold and the unit became vacant;

- Repeals provisions permitting larger rent increases for a new tenant after a vacancy;

- Lowers the rent increase cap for necessary Major Capital Improvements ("MCIs")—such as the installation of a new roof, new elevators, or new boilers—from 6% to 2% in rent-stabilized apartments in New York City, from 15% to 2% in rent-controlled apartments in New York City, and from 15% to 2% in other counties when landlords make MCIs; eliminates such increases after 30 years; and retroactively imposes these MCI rent increase caps on increases attributable to MCIs that were approved within the 7 years prior to the amendment taking effect;

- Imposes a cap of $15,000 over 15 years on property owners' recoverable costs for Individual Apartment Improvements ("IAIs")—such as new kitchen appliances, renovated bathrooms, new flooring, new air conditioners, or a security alarm—limits owners to just three IAIs over that period (with the $15,000 cap applied cumulatively), drastically lowers the size of the monthly rent increases available to recover those costs, and eliminates the increases after 30 years—which together with the MCI restrictions will have the effect of decreasing the quality of rent-regulated housing;

- Eliminates sunset provisions that had previously required the State Legislature to affirmatively declare an ongoing "emergency" every few years in order to extend the rent-regulation regime;

- Divests local rent guidelines boards of the ability to authorize vacancy increases on their own (or to authorize any increases based on a unit's current rent level or the amount of time since the owner's last authorized rent increase); and

- Imposes onerous restrictions on evicting tenants who do not pay their rent, potentially extending their tenancies for up to a year without just compensation to property owners.

3.      Moreover, the new statute's severe restrictions on cooperative and condominium conversions in New York City—requiring 51% of all current tenants to enter into purchase agreements for their apartments, even for buildings that are not rent-regulated (whereas under the prior version of the statute, a non-eviction plan could be declared effective once the property owner secured purchase agreements for 15% of the apartments, either from the current tenants or from *bona fide* outside purchasers who intended to occupy the unit once it became vacant)—

gives tenants what amounts to a collective veto to block co-op/condo conversion plans going forward, thereby precluding property owners from exiting the rental business absent majority tenant approval and effectively converting tenants into shareholders (even though they, in fact, own none of the equity in the buildings).  This is a marked and unconstitutional deprivation of property owners' rights to dispose of their properties and a drastic elimination of a potentially profitable means of doing so, including with respect to the Plaintiffs here who contemplated the conversion of their buildings.

4.      The collective consequence of the HSTPA will be to, *inter alia*: (1) strip rent-regulated properties of economic value; (2) erode the quality of New York's housing stock because it will be prohibitively expensive to maintain current buildings, as property owners will be unable to recoup expenses for renovations and capital improvements; (3) reduce the quantity of available housing stock as deteriorated units are taken off the market; (4) exacerbate any housing shortage because tenants will be further disincentivized from giving up their apartments and moving as market conditions shift, because units will be permanently rent-regulated at absurdly reduced rents, and because it will be too expensive for developers to build new units because of all of the market distortions caused by rent regulation; and (5) drive down construction and renovation work, because developers and property owners are disincentivized, hurting those employed in the construction industry.

5.      These changes, and the many others discussed below, form an omnibus package of amendments that—individually and collectively—are facially invalid on multiple constitutional grounds under both the Federal and State Constitutions, including because they have so stripped owners of being able to derive value from their properties that this amounts to an unconstitutional "taking" without just compensation and because their numerous

irrationalities render the HSTPA defective under the due process and equal protection clauses under any level of constitutional scrutiny.  This new legislation directly contravenes its purported intent—supposedly, to preserve affordable housing in New York.  It will, in fact, do the opposite.  By extending rent regulation even to vacant high-rent apartments, making it cost-prohibitive for owners to maintain or improve their properties, and disincentivizing tenants to move in response to market forces, this law will reduce the availability of affordable housing and leave rent-regulated properties in an ever-increasing state of disrepair or abandonment.  The HSTPA's substantial impairment of existing contracts also renders it invalid under the contracts clause.  The only real winners here will be the wealthy white tenants who, according to U.S. Census Bureau data, already disproportionately benefit from rent regulation, and who are now poised to receive a massive windfall at the expense of minority renters who will be frozen out of historically majority-white neighborhoods.  By exacerbating the law's disparate impact, the HSTPA perpetuates residential racial segregation in New York and negatively impacts the diversity of New York rental housing, harming owners, tenants, and the community as a whole, in violation of the federal Fair Housing Act, 42 U.S.C. §§ 3601 *et seq.* (the "FHA").  The HSTPA should therefore be stricken in its entirety; in the alternative, and at the very least, its most offensive provisions must be stricken.

6.      The HSTPA constitutes an unconstitutional taking—both facially and as applied to the small landlord owners who are Plaintiffs here—for at least two independent reasons.

7.      *First*, it deprives owners—including Plaintiffs—of their fundamental rights to possess, use, admit or exclude others, and dispose of their property, thereby effecting an unconstitutional physical taking of private property without any (let alone just) compensation.  Among other things, by virtue of the amendment to the co-op/condo conversion rules, property

owners are now quite literally forced to secure majority tenant consent in order to dispose of their property and exit the rental business via a conversion.  That is, the right to dispose (and control the use) of their property is transferred to their tenants, who are effectively elevated to the status of equity stakeholders in the subject properties.  And by removing the sunset provision on this conversion restriction, the State Legislature has now ***permanently*** abrogated one of the core ownership rights in the bundle associated with property ownership, inexplicably transferring that right to non-owners.

8.      Similarly, by severely restricting property owners' ability to reclaim possession of their rent-regulated units even for ***personal use***, the HSTPA has cut at the very core of owners' rights to control the possession and use of their own property.  Indeed, each owner may now recover only one such unit, even if that owner demonstrates an "immediate and compelling necessity" (itself a hefty burden) to recover additional units.

9.      *Second*, the HSTPA constitutes a regulatory taking because it has devalued and rendered unprofitable landlord owners' properties, interfered with their reasonable investment-backed expectations in those properties, and deprived them of core property rights to such a degree and in such a manner that it is the equivalent of a government appropriation, again without just compensation.  In doing so, the new law forces a subset of private property owners to bear the economic burdens (without a corresponding benefit) of what is essentially a government-sponsored affordable housing initiative that, in fairness and justice, should be funded, if at all, by the public as a whole.

10.     In Justice Holmes' formulation, "while property may be regulated to a certain extent, if a regulation goes too far it will be recognized as a taking."  *Palazzolo v. Rhode Island*, 533 U.S. 606, 617 (2001) (quoting *Penn. Coal Co. v. Mahon*, 260 U.S. 393, 415 (1922)).  The

HSTPA "goes too far and effects a regulatory taking" based on an array of factors, including the statute's "economic effect on the landowner[s], the extent to which the regulation interferes with reasonable investment-backed expectations, and the character of the government action." *Id*. (citing *Penn Central Transp. Co. v. City of New York*, 438 U.S. 104, 124 (1978)).

11.     Owners, including Plaintiffs, purchased and invested in their properties with the reasonable investment-backed expectation that they would be able to recoup their investments and profitably run their buildings based on, *inter alia*, a certain percentage of units coming off rent regulation over time, certain specific formerly permitted increases in rent, reasonable recoupment of MCI investments through permanently increased rents at the previously permitted rent increase levels, the ability to convert buildings to cooperatives and condominiums under the previously applicable rules, and the like.  Given that owners already had to compensate for the market-distorting effects of rent-regulation (such as perpetual renewal and succession rights) under the pre-amendment regime, the imposition of these draconian restraints on owners' rights obliterates what little recourse owners had left and makes it impossible for them to realize any sort of reasonable return or profit on their investments, which in turn compromises the underlying asset resale value of their properties and destroys their reasonable investment-backed expectations of profitability and appreciating asset value.

12.     The HSTPA accomplishes this by, *inter alia*, limiting owners' ability to remove rental units from rent-regulation by repealing the high-rent deregulatory provisions; limiting owners' ability to raise rents upon a vacancy; curtailing owners' ability to raise rents to recover the costs of MCIs and IAIs, including those renovations required simply to keep a unit in the rental market at all following a lengthy tenancy; applying the new limitations on owners' ability to raise rents to recover the costs of MCIs retroactively to MCI investments approved since

2012; prohibiting owners from renewing leases at the legal regulated rent after having previously offered a lower "preferential" rent; effectively destroying owners' ability to dispose of or otherwise recover their investments in rent-regulated buildings via a conversion (especially given the economic incentives for regulated tenants not to purchase their units); depriving owners of the ability to select their incoming tenants or obtain adequate security to protect their legitimate property interests; and even denying owners the right to reclaim occupancy for their own personal use.  These devastating effects are amplified for small owners.  The character of this governmental action—which eviscerates owners' fundamental rights to dispose of, exclude others from, and personally use and possess their own property (and does so in perpetuity), and which in the case of the co-op/condo conversion restrictions applies even to fully market-rate buildings—confirms that this "regulation" is in fact an unconstitutional regulatory taking of private property.

13.     These effects are not by accident:  public statements by public officials who sponsored the legislation reveal that this law was openly and notoriously intended to transfer property from owners to tenants.

14.     On June 18, 2019, State Senator Julia Salazar—one of the law's sponsors—admitted in the course of discussing the new law with the press that "I don't believe that housing should be for profit."  In that same interview, Senator Salazar went on to express her view that property "doesn't truly belong to us even [when] we have the monetary resources to purchase it and, to put it really bluntly, to take it away from someone else or from the collective, if it isn't owned by someone else or wasn't lost by someone else."

15.     These are not one-off statements by a rogue legislator.  To the contrary, in their joint statement announcing the bill's passage, Senate Majority Leader Andrea Stewart-Cousins

and Assembly Speaker Carl Heastie expressed their official view that "[f]or too long, power has been tilted in favor of landlords."  Tellingly, they did not use the phrase "tilted *too far* in favor of landlords."  Instead, they question landlords, who are lawful private property owners, having the "power" of lawful ownership rights at all.  The leaders of the New York State Legislature thus sought to take this "power" from landlords and transfer it to tenants.  This is confirmed by provisions such as the co-op/condo conversion amendment, which as noted above effectively confers an equity right (in the form of a 51% collective veto over conversion plans) upon non-owner tenants.  Thus, the HSTPA is not targeted at curing abusive practices at the margins but, rather, at wholly undermining our constitutionally-enshrined system of private property ownership rights.

16.     Moreover, the leaders' joint statement concedes that these new infringements on private ownership rights are the most stringent "in history."  In other words, they acknowledge that the law now at issue is wholly unlike anything that has previously been tested in the courts.

17.     The State is thus using the veneer of "regulation" to convert private property into a permanent stock of affordable housing, rather than funding the creation of such housing stock out of the public fisc, and it is doing so without providing any form of compensation to the private property owners whose property is being commandeered for this purpose.

18.     Before the HSTPA's enactment, New York's rent regulations had insulated generations of tenants from the natural effects of market changes by artificially limiting the legal rent that property owners could charge in buildings covered by the laws, including approximately half of New York City's rental units.  These regulations required landlords to continuously extend lease renewals to (or otherwise extend the tenancies of) rent-regulated tenants and their "family members" (as that term is broadly defined), and thus severely restricted them in their

ability to control their property and earn reasonable returns on their investments.  However, recognizing the temporary, "emergency" nature of rent regulation, the State Legislature had built in pathways for eventual deregulation of affected properties.  For instance, under the pre-HSTPA version of the law, certain rent-regulated apartments could be deregulated once the monthly rent reached a certain threshold amount, either upon vacancy or if the tenant's income exceeded $200,000.  These provisions were consistent with the ultimate goal of rent regulation, which has expressly and at all times been one of eventual ***deregulation***.

19.     In a dramatic shift, however, the HSTPA has now stripped away these and other key provisions, codifying a harsh regime that forever traps approximately 1,000,000 rental units—all privately owned—under the strictures of rent regulation, forcing private property owners to effectively surrender their property rights and foot the bill for the State's affordable housing initiative.  Having excised crucial deregulatory provisions such as the high-rent/high-income threshold—thereby enabling wealthy tenants making over $200,000 to retain essentially permanent tenancy rights at the expense of those most in need of affordable housing, not to mention the rights of property owners—the State Legislature has divorced the law from both common sense and constitutional doctrine.

20.     And, of course, all of this social engineering targeting landlords for political benefit comes at the expense of private property owners, whose economic interests in their rental properties will be obliterated under a regulatory scheme that effectively locks properties into rent regulation permanently.  These property owners are being unfairly targeted, vilified without basis in fact, and forced to bear the financial burden of an irrational government policy that should be paid for—if at all—by taxpayers, not private property owners.  The Legislature's efforts to effectuate an explicit expropriation of property at the behest of advocacy groups—as reflected in

this latest iteration of now "permanent" rent regulation—cannot be countenanced as a matter of constitutional law.

21.     The landlord-owner Plaintiffs here, each of whom owns one or more multifamily residential buildings in New York, therefore bring this action challenging the HSTPA as unconstitutional under multiple provisions of both the United States and New York State Constitutions.  They seek declarations that the HSTPA is unconstitutional—both facially and as applied to them and their properties—and unlawful under the FHA; a permanent injunction enjoining Defendants and their successors from enforcing the HSTPA, or, in the alternative, certain challenged provisions of the HSTPA; and, to the extent the takings challenge is resolved on an as-applied basis without injunctive relief, an award of just compensation.

## PARTIES

22.     Plaintiff G-Max Management, Inc. ("G-Max") is a corporation organized under the laws of the State of New York.  G-Max owns an eight-unit residential apartment building located at 1137 Longfellow Avenue in the Bronx, New York.  All eight units in G-Max's building are rent-stabilized pursuant to New York City's Rent Stabilization Law (the "RSL").  G-Max has owned the property since 2002.

23.     Plaintiff 1139 Longfellow, LLC ("Longfellow") is a limited liability corporation organized under the laws of the State of New York.  Longfellow owns an eight-unit residential apartment building located at 1139 Longfellow Avenue in the Bronx, New York.  All eight units in Longfellow's building are rent-stabilized pursuant to the RSL.  Longfellow has owned the property since 2012.

24.     Plaintiff Green Valley Realty, LLC ("Green Valley") is a limited liability corporation organized under the laws of the State of New York.  Green Valley owns a twenty-

unit residential apartment building located at 26 West 131st Street in New York, New York.  All twenty units in Green Valley's building are rent-stabilized pursuant to the RSL.  Green Valley has owned the property since 2005.

25.     Plaintiff 66 East 190 LLC ("East") is a limited liability corporation organized under the laws of the State of New York.  East owns a nineteen-unit residential apartment building located at 66 East 190th Street in the Bronx, New York.  All nineteen units in East's building are rent-stabilized pursuant to the RSL.  East has owned the property since 2011.

26.     Plaintiff 4250 Van Cortlandt Park East Associates, LLC ("Van Cortlandt") is a limited liability corporation organized under the laws of the State of New York.  Van Cortlandt owns a 53-unit residential apartment building located at 4250 Van Cortlandt Park East in the Bronx, New York.  All 53 units in Van Cortlandt's building are rent-stabilized pursuant to the RSL.  Van Cortlandt has owned the property since 1995.

27.     Plaintiff 181 W. Tremont Associates, LLC ("Tremont") is a limited liability corporation organized under the laws of the State of New York.  Tremont owns a 37-unit residential apartment building located at 181 W. Tremont Avenue in the Bronx, New York.  All 37 units in Tremont's building are rent-stabilized pursuant to the RSL.  Tremont has owned the property since 1995.

28.     Plaintiff 2114 Haviland Associates, LLC ("Haviland") is a limited liability corporation organized under the laws of the State of New York.  Haviland owns a 32-unit residential apartment building located at 2114 Haviland Avenue in the Bronx, New York.  All 32 units in Haviland's building are rent-stabilized pursuant to the RSL.  Haviland has owned the property since 1995.

29.     Plaintiff Siljay Holding LLC ("Siljay") is a limited liability corporation organized under the laws of the State of New York.  Siljay owns a 59-unit residential apartment building located at 2105 Burr Avenue in the Bronx, New York.  Fifty-seven of the 59 units in Siljay's building are rent-stabilized pursuant to the RSL, and the other two are rent-controlled pursuant to New York City's City Rent and Rehabilitation Law (the "City Rent Control Law").  Siljay has owned the property since 1995.

30.     Plaintiff 125 Holding LLC ("Holding") is a limited liability corporation organized under the laws of the State of New York.  Holding owns a ninety-unit residential apartment building located at 125 Elliott Avenue in Yonkers, New York.  Eighty-nine of the ninety units in Holding's building are rent-stabilized pursuant to the Emergency Tenant Protection Act (the "ETPA"), and the other is rent-controlled pursuant to the Emergency Housing Rent Control Law of 1946 (the "State Rent Control Law").  Holding has owned the property since 1995.

31.     Plaintiffs Jane Ordway ("Ordway") and Dexter Guerrieri ("Guerrieri") are residents of Brooklyn, New York.  Ms. Ordway and Mr. Guerrieri are owners as tenants-in-common of, and live in, an eight-unit residential apartment building located at 12 Remsen Street in Brooklyn, New York.  Ms. Ordway and Mr. Guerrieri have owned the building as tenants-in-common since 2018, and from 2013 through 2018 they owned it indirectly through a limited liability company.  Three of the units in the building are rent-stabilized pursuant to the RSL (although two of those three are occupied by Ms. Ordway and Mr. Guerrieri and thus are no longer operated as rentals).

32.     Plaintiff Brooklyn 637-240 LLC ("Brooklyn") is a limited liability corporation organized under the laws of the State of New York.  Brooklyn owns eight-unit residential apartment buildings located at 637 Henry Street and 240 President Street in Brooklyn, New

York. Three of the eight units at 637 Henry Street are rent-stabilized pursuant to the RSL, and another is rent-controlled pursuant to the City Rent Control Law. Two of the eight units at 240 President Street are rent-stabilized pursuant to the RSL, and another is rent-controlled pursuant to the City Rent Control Law. Brooklyn has owned these two properties since 2012.

33. Plaintiff 447-9 16th LLC ("Sixteenth") is a limited liability corporation organized under the laws of the State of New York. Sixteenth owns eight-unit residential apartment buildings located at 447 16th Street and 449 16th Street in Brooklyn, New York. Five of the eight units at 447 16th Street are rent-stabilized pursuant to the RSL. Four of the eight units at 449 16th Street are rent-stabilized pursuant to the RSL. Sixteenth has owned these two properties since 2012.

34. Defendant State of New York is a sovereign state.

35. Defendant Letitia James is the Attorney General of the State of New York and is responsible for the administration and enforcement of certain statutory provisions that have been amended by the HSTPA, including Section 352-eeee of the General Business Law. The AG maintains Executive Offices at The Capitol, Albany, New York 12224, and at 28 Liberty Street, New York, New York 10005. The AG is named in her official capacity.

36. Defendant RuthAnne Visnauskas is the Commissioner of DHCR and is responsible for the administration and enforcement of the RSL, ETPA, City Rent Control Law, and State Rent Control Law. DHCR has main offices located in the County of New York at 641 Lexington Avenue, New York, New York 10022, and at 25 Beaver Street, New York, New York 10004. Ms. Visnauskas is named in her official capacity.

37. Defendant Woody Pascal is a Deputy Commissioner of DHCR. In that role, Mr. Pascal runs DHCR's Office of Rent Administration. Mr. Pascal is named in his official capacity.

38.     Defendant City of New York is a municipal corporation organized and existing under the laws of, and located within, the State of New York.

39.     Defendant County of Westchester is a municipal corporation organized and existing under the laws of, and located within, the State of New York.

40.     Defendant City of Yonkers is a municipal corporation organized and existing under the laws of, and located within, the State of New York.  Yonkers is located within the County of Westchester.

## JURISDICTION AND VENUE

41.     This action is brought under 42 U.S.C. § 1983, and the inherent authority of federal courts to protect rights safeguarded by the Constitution and laws of the United States, in particular:

a)  the takings clause of the Fifth Amendment, incorporated against the States by the Fourteenth Amendment;

b)  the due process clause of the Fourteenth Amendment;

c)  the equal protection clause of the Fourteenth Amendment;

d)  the contracts clause, U.S. Const. art. I, § 10, cl. 1; and

e)  the Fair Housing Act, 42 U.S.C. §§ 3601 *et seq*.

42.     Additionally, this action raises related claims arising under the New York State Constitution, in particular:

a)  the takings clause of Article I, § 7;

b)  the due process clause of Article I, § 6; and

c)  the equal protection clause of Article I, § 11.

43.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1343, 1367, and 2201, and 42 U.S.C. § 3613.

44.     Venue is proper in the Southern District of New York pursuant to 28 U.S.C. § 1391, because a substantial part of the events and omissions giving rise to the claims alleged herein have occurred, and will continue to occur, in this district, and because a substantial part of the property that is the subject of this action is situated in this district.

## FACTUAL ALLEGATIONS

### I.     Rent Regulation Arises as a Post-War Emergency Measure in New York

45.     In 1942, during World War II, the United States Congress enacted the Emergency Price Control Act, which established an expansive price control regime that extended to residential rental buildings.

46.     In anticipation of the withdrawal of federal rent control following the war, the State of New York passed the Emergency Housing Rent Control Law of 1946 (codified as amended at 23 N.Y. Unconsol. Law § 8581 *et seq*.) (the "State Rent Control Law").

47.     In 1962, the State passed the Local Emergency Rent Control Act (codified as amended at 23 N.Y. Unconsol. Law § 8601 *et seq*.), which enabled the City of New York to itself create and administer a rent control program.

48.     Pursuant to this local enabling statute, the New York City Council enacted the City Rent and Rehabilitation Law (codified as amended at N.Y.C. Admin. Code § 26-401 *et seq*.) (the "City Rent Control Law").

49.     Rent control generally does not apply to post-1947 housing.

50.     In 1969, citing "a serious public emergency" in housing, the City Council enacted the Rent Stabilization Law (codified as amended at N.Y.C. Admin. Code § 26-501 *et seq*.) (the "RSL") to supplement the existing rent control regime.

51.     At the time of its enactment, the RSL applied only to certain rental housing completed prior to 1969 and not otherwise governed by rent control.

52.     Five years later, in 1974, the State supplemented and modified the RSL with the Emergency Tenant Protection Act (codified as amended at 23 N.Y. Unconsol. Law § 8621 *et seq.*) (the "ETPA").

53.     Among other things, the ETPA brought buildings that had been constructed between 1969 and 1973 within the ambit of rent stabilization, restored apartments that had previously been decontrolled or destabilized (on account of vacancy) to New York City's rent-stabilization regime, and expanded rent regulation to Westchester, Nassau, and Rockland Counties.

54.     Within Westchester, Nassau County, and Rockland County, the ETPA only applies within municipalities that have affirmatively opted into the rent-stabilization regime by declaring their own housing emergencies (which are contingent upon vacancy rates remaining at or below 5%).

55.     Yonkers, which is located in Westchester County, adopted the ETPA by declaring a housing emergency in 1974.

56.     Rent stabilization does not apply to buildings constructed from 1974 onward, except for certain buildings that are regulated in connection with certain tax abatement programs.

57.     DHCR has promulgated regulations pursuant to the various rent control and rent stabilization statutes.  These regulations are codified in Chapters VII (rent control) and VIII (rent stabilization) of Subtitle S of Title 9 of the New York Codes, Rules and Regulations.  *See* 9 NYCRR § 2050.1 *et seq.* (rent control); 9 NYCRR § 2500.1 *et seq.* (rent stabilization).

58.     In addition to capping the rent that landlords are permitted to collect on their controlled or stabilized units, the pre-HSTPA rent-regulation regime mandated that landlords offer renewal leases (or otherwise extend rent-controlled tenancies) except in certain limited circumstances and extended these renewal rights to a broadly defined group of "family member" successors, creating *de facto* inheritance rights on behalf of rent-regulated tenants.

59.     Under the RSL and the ETPA, local rent guidelines boards for the City and each of the participating New York counties are responsible for establishing annual maximum rent increase levels for rent-stabilized units located within their respective jurisdictions.  In recent years, these *de minimis* authorized rent increases have consistently failed to keep pace with the ever-increasing costs of maintaining owners' aging rent-regulated properties.  Therefore, in order to cover costs, keep their buildings profitable, and have any chance of realizing a reasonable return on their investments, owners have been entirely dependent on certain key statutory provisions that allowed them to increase rents beyond the artificially low levels set by the rent guidelines boards—for instance, provisions permitting larger increases between tenancies or after an owner incurred costs improving the property.

60.     Approximately one-half of New York City's rental units, or about 1,000,000 apartment units, are subject to rent regulation.  To trigger and justify the continuation of rent regulation under New York law, every three years the City Council has declared a housing emergency, based on a citywide vacancy rate below 5% on all units.  Recently, vacancy rates for all rental units were 3.12% in 2011, 3.45% in 2014, and 3.63% in 2017.

61.     When it passed the RSL in 1969, the New York City Council declared "that a serious public emergency continues to exist in the housing of a considerable number of persons . . . [and] . . . the transition from regulation to a normal market of free bargaining between

18

landlord and tenant, while still the objective of state and city policy, must be administered with due regard for such emergency."

62.     The City Council has periodically renewed this finding in the years since, most recently in 2018.

63.     The central government interest that rent regulation purports to further is the provision of affordable housing.  But, in reality, regulation has only decreased the availability of affordable housing by effectively taking vast swaths of the housing stock offline (because people are massively disincentivized from moving), by making it too expensive to build new affordable rentals because of all of the market distortions caused by rent regulation, and by endowing wealthy New Yorkers with a perpetual right to an apartment from the stock of low-rent housing.

64.     The vacancy statistics bear this out.  Although New York City's overall vacancy rate in 2017 was 3.63% (below the 5% threshold allowing the City to renew its "emergency" declaration), the vacancy rate for private non-regulated units was 6.07% (above the 5% threshold), while the vacancy rate for rent-stabilized units was a mere 2.06%.

## II.     The HSTPA Transforms Rent Regulation into a Sweeping and Effectively Permanent Regime that Will Irrationally Decrease and Degrade Affordable Housing

65.     New York Governor Andrew Cuomo signed the HSTPA (A.8281/S.6458) into law on June 14, 2019.

66.     The HSTPA, broken into Parts A through O, amends multiple statutes governing residential rental properties and the landlord-tenant relationship, including, *inter alia*, the various State and City rent control and stabilization statutes discussed above, the General Obligations Law, the General Business Law (the "GBL"), the Judiciary Law, the Real Property Law (the "RPL"), the Real Property Actions and Proceedings Law (the "RPAPL"), and the CPLR.

67.     On June 24, 2019, the Governor signed into law Chapter 39 of the Laws of 2019. Part Q of that law consisted of certain further amendments and modifications to the HSTPA and the various other statutes the HSTPA had amended (the "Chapter Amendments").  Unless otherwise specified, references herein to the HSTPA include both the initial June 14, 2019 law and the Chapter Amendments, and any references to HSTPA provisions that were themselves further modified by the Chapter Amendments should be read to include those further modifications as well.

68.     Viewed in its totality, the HSTPA obliterates property owners' contractual rights to enforce leases, effectively transforms tenants into permanent occupants, and in doing so constitutes an unconstitutional taking, among its numerous other constitutional infirmities.

69.     Parts A through K of the HSTPA significantly alter—and tighten—the rent-regulation statutes in a manner than irrationally divests property owners of their core rights, including the rights to control the use and possession of their property.

70.     To this day, the various rent-regulation statutes continue to expressly state that the ultimate objective of State and City policy is to ***deregulate*** the rental market and thereby return to a state of free-market bargaining.  *See* 23 N.Y. Unconsol. Law §§ 8581, 8602, 8622; N.Y.C. Admin. Code §§ 26-401, 26-501.

71.     Nevertheless, the new amendments severely ***limit*** deregulation and rent increases—while also repealing (in Part A) the sunset provisions that had previously required the Legislature to periodically revisit the supposed need for rent regulation, and enabling (in Part G) the statewide expansion of rent stabilization.

72.     Among other things, the HSTPA (in Part D §§ 2-7 (as clarified by Chapter Amendments §§ 5-6), Part E, and Chapter Amendments §§ 7-9) eliminates high-rent vacancy

20

and high-rent/high-income deregulation by repealing provisions that allowed units to be deregulated once the monthly rent crossed a statutory high-rent threshold (previously $2,775 in New York City and Nassau County, $2,830 in Westchester, and $2,734 in Rockland County) and either the unit became vacant or the tenant's income equaled or exceeded $200,000 in the preceding two years.

73.    According to lawmakers, these deregulatory provisions had led to the deregulation of more than 300,000 units since they were enacted in 1994.  Their repeal highlights that the HSTPA has nothing at all to do with a purported housing "emergency," given that the vacancy rate for New York City apartments renting above $2,500 per month is 8.74%.

74.    Other changes to the rent-regulation regime include:

a)  Repealing (in Part B) provisions that had allowed a property owner to raise rents as much as 20 percent each time a unit became vacant (thereby mitigating at least some of the burden these owners were forced to bear, and doing so in a way that had *no* impact on existing tenants);

b)  Repealing (in Part B) related provisions that had allowed vacancy rents to be raised by additional amounts based on the duration of the previous tenancy (similarly mitigating owners' burdens without any corresponding impact on existing tenancies);

c)  Prohibiting (in Part C) the rent guidelines boards from authorizing vacancy increases on their own, or from authorizing any increases based on a unit's current rent level or the amount of time since the owner's last authorized rent increase;

d)  Making "preferential rents" the base rent for lease renewal increases, and thereby prohibiting owners who had voluntarily offered tenants a "preferential rent" (*i.e.*,

a rent *below* the legal regulated rent) from raising the rent to the full legal rent upon renewal (Part E (as clarified by Chapter Amendments §§ 11-12))—that is, forcing property owners who voluntarily offered a lower rent at one point in time to continue offering that same discount until vacancy (irrespective of the terms of the parties' lease), even where the owner agreed to the preferential rent *before* the HSTPA took effect, and even though the legal regulated rent is obviously one that the government has already deemed to be reasonable; and

e)  Further limiting (in Part H) annual rent increases for rent-controlled units by capping them at the average of the previous five years of increases authorized for rent-stabilized apartments, and prohibiting owners of rent-controlled units in New York City from adjusting rents to account for fuel costs.

75.    The absurdity of these provisions is apparent on their face:  by artificially suppressing rents and simultaneously ensuring that apartments will remain under rent-regulation regardless of how high the rent eventually climbs (and no matter how high the tenant's *income* climbs), the HSTPA will massively disincentivize tenants from vacating their apartments (even once they no longer need rent regulation), thereby perpetuating the very vacancy "emergency" that the rent-regulation regime was ostensibly designed to address in the first place, and in doing so will ensure that the "emergency" (and thus the purported justification for continued regulation) will remain intact, thus perpetuating even more regulation.

76.    That is, the "emergency" is now self-perpetuating, such that what began as a temporary wartime measure will now effectively divest property owners of their core ownership rights *in perpetuity*—just as if the government had confiscated the property outright.

77.     Indeed, the Legislature has **conceded** that this was its goal, as its findings in support of the HSTPA (Part D § 1) fault the vacancy deregulation provisions for causing "the loss of vital and irreplaceable affordable housing for working persons and families."

78.     That is, the State apparently views rent-regulated housing as something that belongs to the public at large, rather than something that belongs to its lawful private owners—and it views deregulation as a "loss" to the public, rather than as a restoration of private ownership rights.

79.     The Sponsor's Memo purporting to justify the HSTPA in the State Senate was equally explicit on this point, stating that localities "struggle to protect **their** regulated housing stock."

80.     This same view is captured in the June 14, 2019 press release issued by the State Senate Majority.  For instance, Senator Zellnor Myrie describes how "our communities have **lost** hundreds of thousands of rent regulated units."  Senator Joseph Addabbo, Jr. frames the issue in terms of "ensuring an adequate supply of affordable housing."  And Senator Jose Serrano declares that "[p]reserving existing affordable housing is a key component of tackling the affordability crisis."

81.     Senator Brian Kavanagh, the chairman of the New York State Senate Committee on Housing, Construction and Community Development and another co-sponsor of the bill, expressed this same sentiment in a media interview following the law's enactment:  "[W]hat has happened over the course of many years is all of the efforts in government to increase the supply of affordable housing have been offset by loss of affordable housing and the rent-stabilized stock because of deregulation and some of the other loopholes.  By closing those loopholes, we allow government and other people concerned about affordability to make real gains, and not just be

treading water, as we have been for a number of years. . . . Changing the rent laws is not intended to create new affordable housing. **It is intended to maintain the affordable housing we have** and what it does is it ends a very rapid loss of affordable housing, which has happened over the course of many years. We've had hundreds of thousands of units deregulated. **And so it doesn't create new housing, but it prevents loss of housing, which is a net gain for everybody**."

82.     Further illustrating this flagrant disregard for basic property rights, the HSTPA even tightens the circumstances under which property owners can reclaim their rent-regulated units **for their own personal use**, even going so far as to limit owners to one such reclamation (even upon a showing of "immediate and compelling necessity"), and even if the landlord already commenced steps to effect the reclamation **prior to the statute's effective date** (Part I). For owners whose units are governed by the RSL, the "immediate and compelling necessity" standard is itself a newly imposed limitation on their ownership rights, as is a new duration-of-tenancy exception that precludes owners of rent-stabilized units from utilizing the personal use exception at all if the existing tenant has rented the unit for fifteen years or more (unless the owner can provide that tenant with equivalent rent-stabilized housing nearby), in both instances again without any exception for owners—including Plaintiffs Jane Ordway and Dexter Guerrieri—who took steps to lawfully reclaim their units prior to the HSTPA's effective date (Part I § 2).

83.     The legislators made no secret of what they were doing. As Senator Peter Harckham explained during the June 14, 2019 vote on the law's passage: "[T]he first rule of affordable housing is protect the stock that you have. And that's what this regulation and that's what these laws will do. We've got to protect what we have. **It's a heck of a lot cheaper to protect housing stock than to build new stock**."

84.     The State is thus using the pretext of "regulation" to convert private property into a permanent stock of government-sponsored affordable housing, rather than funding the creation of such housing with public funds, and it is doing so without providing any form of compensation to the private property owners whose property is being commandeered for this purpose.

85.     The HSTPA also imposes changes (in Part K) that will limit major capital and individual apartment improvements, including some that will impact property owners' ability to recoup costs *already incurred* under the pre-amendment regime.  Among other things, the HSTPA:

> a)   Limits rent increases for major capital improvements ("MCIs") (Part K §§ 4-11; Chapter Amendments §§ 21-28) by (1) lowering the rent increase cap from 6% to 2% in rent-stabilized apartments in New York City, from 15% to 2% in rent-controlled apartments in New York City, and from 15% to 2% in other counties when landlords make MCIs; (2) applying this same 2% cap going forward on MCI rent increases attributable to MCIs that were approved within the *prior* seven years; (3) lengthening the MCI formula's amortization period; (4) eliminating MCI increases after 30 years instead of allowing them to remain in effect permanently (and with no exception to account for periodic vacancies during the 30-year period); (5) significantly tightening the rules governing what spending may qualify for MCI increases and requiring that 25% of MCIs be inspected and audited; and (6) arbitrarily eliminating MCIs altogether for buildings with 35% or fewer rent-regulated units; and

b)  Limits rent increases for individual apartment improvements ("IAIs") (Part K §§ 1-3; Chapter Amendments §§ 18-20, 36) by (1) capping the amount of recoverable IAI spending at $15,000 per apartment, spread across a maximum of just three IAIs, over a 15-year period (with no exception for apartments requiring substantial work—such as plumbing renovations and new kitchen and bathroom fixtures—following a lengthy tenancy), (2) drastically lowering the size of the monthly rent increases available to recover those costs (from one-fortieth or one-sixtieth of the total cost, depending on the size of the building, to just one-one hundred sixty-eighth or one-one hundred eightieth—that is, to approximately *0.595% or 0.556%*), and (3) making IAI increases temporary for 30 years rather than permanent (again without accounting for periodic vacancies).

86.    These restrictions on MCIs and IAIs, which apply even to improvements required to ensure compliance with applicable housing and building codes, will result in the severe deterioration of the existing rent-regulated housing stock and a return to the bad old days in which the rent-regulation laws were so backwards and constricting that it was economically infeasible for property owners to invest in the upkeep and modernization of their properties.

87.    Indeed, given the severe restriction on property owners' ability to recoup the costs associated with necessary IAIs and the absence of any exception for substantial renovations upon vacancy (compounded by the elimination of vacancy and longevity rent increases), many owners—including Plaintiffs Tremont and Holding—will be unable to restore the units to rentable condition and instead will be left with no viable option but to leave the units vacant. Thus, by rendering it impossible for landlords to pursue improvements or shift properties off rent

regulation, the HSTPA creates a perpetual stasis that effectively compels owners to leave their properties in their current state.

88.     Moreover, by imposing the same 2% cap going forward on MCI rent increases attributable to MCIs that were approved within the prior seven years, the HSTPA retroactively caps rent increases for property owners who already spent significant sums of money on capital improvements in reliance on their ability to recoup those investments through higher rents.

89.     Such property owners invested significant sums of money on capital improvements with the reasonable understanding and expectation that they would be able to raise rents going forward in the amounts permitted under then-existing law to recoup a portion of those costs.

90.     Adding insult to injury, the HSTPA combines its sweeping curtailment of authorized rent increases with a retroactive expansion (in Part F) of the limitations, record-retention, and lookback periods for rent overcharge claims.  Those expansions expressly apply to "any" overcharge claim, and courts are now permitted to look back *indefinitely* in evaluating such claims, with no exception for owners who purchased a building years after the alleged overcharge first occurred and who relied in good faith on the existing statutory scheme in conducting due diligence and obtaining records (such as supporting documentation for IAI increases) from the prior owner.  These new owners are now exposed to overcharge penalties and damages even though they acted in accordance with all applicable legal requirements.

91.     The aggregate effect of these drastic infringements on fundamental property rights is to strip rent-regulated properties of economic value and eliminate any chance that owners had of realizing a reasonable return or profit on their investments.  Under the pre-amendment regime, owners were already forced to cope with artificially suppressed rent levels.  Now, the HSTPA

has sealed their fate by depriving them of essential revenue needed to defray the high cost of

maintaining their aging properties—costs that include property taxes, heating and electricity,

maintenance, salaries and benefits, investments in apartment and building upkeep required by

local law, and other necessary expenses.

92.     As a recent *Crain's* article explained, the impact of this devaluation and its large-

scale negative effects on salability are reflected in a 14% drop in the stock price of New York

Community Bancorp that occurred in October 2019, with an "abrupt stop" in the bank's loan

growth indicating that "its customers have stopped buying apartment buildings" in light of the

new law.

93.     The market distortions created by the HSTPA will reduce the overall size of the

housing market (regulated or otherwise), compounding the adverse effects of rent-regulation

while forcing the market prices of nonregulated units to spike even higher.

94.     As explained by Joseph Strasburg, president of the Rent Stabilization Association:

"Most of these lawmakers were not alive in the 1970s and 1980s to see what legislation like this

did to the city's housing.  Buildings will fall into disrepair, owners will not have the funds to

make necessary repairs to these aging buildings, and thousands of local [construction] jobs will

be lost."

95.     This is not just conjecture, as evidenced by the experiences of the Plaintiff owners

detailed herein.  But Plaintiffs are not the only owners who have been so affected.  In October,

CBS2 reported on a Bronx apartment "that was down to the sticks."  The apartment, located

within a building constructed in the early 1900s, had recently become vacant and was due for its

first renovation in over a decade.  But the owner, non-party Oscar Perez, was left with no choice

but to stop work and leave the apartment vacant, as he could no longer afford the renovation

following the elimination of vacancy increases and the reduction in IAI increases.  Indeed, Mr. Perez had already spent $45,000 on the renovations prior to the HSTPA's enactment—three times the $15,000 maximum the HSTPA now allows over ***fifteen years***.  In fact, based on a review of permit applications, which typically do not even include the costs of flooring and appliances, the *Wall Street Journal* reported in December 2019 that the median interior renovation project in New York City costs ***$60,000***.

96.     Mr. Perez also told CBS2 that, in another vacant unit, he had found mold behind a wall that would cost $5,000 (one third of his total fifteen-year allotment) to repair.  As a result, two of Mr. Perez's twenty units (*i.e.*, 10% of the building) now lie vacant because, in his words, "I just don't have the money to finish it."  Mr. Perez told the reporter that the HSTPA is "a knife through the heart of landlords, private building owners who need the money to exist, to pay their real estate tax, to pay their employees and to buy things from the local suppliers."

97.     CBS2 also interviewed non-party Stephanie Kirnon, whose net rental income was $17,000 in 2018—half the amount required just to fix her roof.  Ms. Kirnon told CBS2 that HSTPA is "making it difficult to do other improvements."

98.     The *Wall Street Journal*'s December 2019 report found that, from July through November of that year, the number of apartment renovations in New York City dropped 44% from the prior year, while spending on such renovations decreased by $71 million.  Tellingly, the number of apartment renovations in other older but unregulated buildings in the City remained unchanged from the previous year.  Overall work in rent-regulated properties also declined during the same period, with the number of work permits decreasing by 24% (compared to just 5% in unregulated older buildings) and spending down $84 million.

99.     The HSTPA also works to impair the contracts that property owners have made with the City to temporarily offer affordable housing in exchange for tax benefits.  For example, the Housing Preservation Program, created by Article XI of the New York Private Housing Finance Law, encourages owners to offer affordable housing, both in new constructions and existing buildings, when they otherwise would not be required to do so.  Owners agree to place a certain number of a building's units into rent regulation, to cap rents and rent increases at set levels for regulated units, and to actively rent out all regulated units.  In return, the City provides these owners with complete or partial exemptions from real estate taxes for up to forty years. Programs such as Article XI have been a major source of affordable housing units and are central to the City's housing plan.  Indeed, tens of thousands of low- to middle-income New Yorkers live in affordable rental units due to Article XI agreements.

100.    When owners entered into Article XI agreements, they had the reasonable expectation that they could raise rents for their units in accordance with contractually agreed-upon increases, and deregulate them at the expiration of contractually specified periods of time. Now, however, the HSTPA will punish these owners by disallowing increases at the levels permitted under the bargain struck between Plaintiffs and the City (which were already far below market rents and market increases), on which Plaintiffs reasonably relied in voluntarily putting units into rent regulation; by forcing their properties into permanent regulation; and by forcing owners to lease units to tenants at rents that make both the individual units and the projects as a whole unprofitable or drive their profitability far below what owners reasonably expected.  The HSTPA provides no exemption for Article XI agreements from its sweeping changes, in contrast to the exemption granted to properties constructed under the similar 421-a program.

101.    In short, the new legislation will drastically exacerbate the preexisting arbitrariness, irrationality, wretched unfairness, and backwards, upside-down effects of rent regulation.

### III.    The HSTPA's Restrictions on Co-Op/Condo Conversions, Which Are Not Limited to Rent-Controlled or Rent-Stabilized Units, Are Unconstitutional

102.    Not content with these sweeping expansions of New York's rent-regulation regime, the HSTPA also makes broad, irrational changes to other State laws that govern rental properties and the landlord-tenant relationship.  These changes apply generally outside the context of rent-controlled or rent-stabilized properties and have no rational relationship to the HSTPA's purported goal of increasing or preserving affordable housing in New York.

103.    Among other things, via an amendment to GBL § 352-eeee, the HSTPA (in Part N) imposes substantial and unjustifiable restrictions on property owners' ability to convert their rental properties into cooperatives or condominiums within New York City.

104.    The amendment eliminates the option of "eviction plans," pursuant to which tenants who did not agree to purchase their units would have to vacate those units once three years elapsed from the plan's effective date.

105.    Thus, the only conversion option even ostensibly available to property owners going forward is the so-called "non-eviction plan," which ensures that the tenants in occupancy when the plan is accepted by the AG will be able to remain in their apartments notwithstanding the conversion.

106.    At the same time, however, the law amends the requirements for non-eviction plans in such a manner as to make them effectively impossible—and mathematically impossible without majority tenant approval.

107.    Under the prior version of the statute, a non-eviction plan could be declared effective once the property owner secured purchase agreements for 15% of the apartments, either from the current tenants or from *bona fide* outside purchasers who intended to occupy the units as they became vacant.

108.    As amended, non-eviction plans now require purchase agreements for ***51%*** of the apartments, ***all*** from current tenants.

109.    That is, even though they do not hold any equity in the units they occupy, tenants now have *de facto* blocking rights that effectively transfer the right to control the use of the property—one of the core rights in the proverbial "bundle of sticks"—from the property owner to the tenants.

110.    Put differently, tenants now have the collective ability to effectively force their residential property owners (and their successors, assuming anyone would want to purchase a building subject to this draconian limitation on disposal rights) to continue operating their buildings as rental properties in perpetuity.

111.    The law confers this right on tenants even though, under a non-eviction plan, those tenants are free to remain in their apartments, as renters, regardless of whether the conversion takes place or not.

112.    In practice, this supposed "amendment" is nothing short of an outright, permanent moratorium on co-op and condo conversions going forward.  Any one-off exceptions will turn on unusual factual scenarios and will only serve to highlight the near-impossibility of obtaining the requisite tenant purchase commitments for Plaintiffs and others who are similarly situated.  And this is clearly by design, given that the new 51% threshold far exceeds even the 35% threshold

that was briefly in effect during the 1970s, which had devastating effects on the conversion market.

113.    Additionally, Plaintiffs Tremont, Siljay, Brooklyn, and Sixteenth had all contemplated the future conversion of their buildings to co-ops or condos, and believed the buildings to be suitable for conversion.  In light of the new restrictions imposed by the HSTPA, such conversions are no longer possible.

114.    The conversion rules, moreover, apply to both regulated and non-regulated buildings, even though there is absolutely no connection between the conversion of non-regulated buildings and the purported government interests served by the HSTPA, and no rational basis for this severe new restriction on the conversion of non-regulated buildings.

115.    At the same time, the infringement on an owner's ability to dispose of his property via a conversion is felt even more severely in the cases of owners, such as Plaintiffs, whose apartments are subject to rent regulation.  The tenants in such units have absolutely no economic incentive to trade their below-market rentals (with perpetual succession rights) for direct ownership and its concomitant costs, and the *de facto* ban will be even more severe.

116.    Given that the existing tenants could not have been evicted anyway under a non-eviction plan, this amendment further demonstrates that the HSTPA is focused not on protecting current tenants (or even just tenants of rent-regulated apartments), but rather on divesting property owners of their rights ***going forward*** in order to create—by regulation instead of government spending—a permanent State-sponsored housing stock.

117.    Indeed, lest there be any doubt that this amendment is meant to effect a permanent deprivation of property rights, HSTPA Part A § 4 repeals the sunset provision that had previously applied to GBL § 352-eeee.

118.     Combined with other provisions of the HSTPA, the new draconian conversion rules operate to create perpetual tenancies at the expense of owners' fundamental property rights (including their right to dispose of their property and exit the rental business) and their reasonable investment-backed expectations.

119.     For owners (such as Plaintiffs) whose properties are subject to rent control or stabilization, this divestment of the right to dispose of property compounds the devaluation effected through the HSTPA's amendments to the rent-regulation regime.  Among other things, this blatant transfer of property rights from owners to tenants necessarily impairs the salable value of the buildings, because any future owners would have to purchase those properties subject to both the HSTPA's enhanced version of self-perpetuating rent regulation *and* this new permanent encumbrance on disposition.

## IV.     Changes to the Landlord-Tenant Laws Amplify the HSTPA's Unconstitutionality

120.     The HSTPA also makes significant changes (in Part M and Chapter Amendments §§ 31-34) to the laws governing the landlord-tenant relationship.  As with the new restrictions on co-op/condo conversions, these amendments govern both rent-regulated and free-market apartments.

121.     The HSTPA amends the RPL in a manner that materially impacts and hampers landlord rights (Part M §§ 2-10), including, *inter alia*:

   a)  Expanding the rebuttable presumption of retaliatory eviction, and providing that offering a renewal lease with an "unreasonable" rent increase constitutes an adverse act that can form the basis for a retaliation claim (Part M § 2);

   b)  Creating a duty to mitigate damages if a tenant breaks a lease, with the burden of proof *on the landlord* as to compliance (Part M § 4);

c) Prohibiting landlords from declining to rent their units to a potential tenant on the grounds that the potential tenant was involved in a past or pending landlord-tenant action or summary proceeding, with a rebuttable presumption of a violation if the landlord utilized a tenant screening agency or inspected court records (Part M § 5);

d) Requiring landlords to send written notice by certified mail if they do not receive rent within five days of the stated payment date, with failure to do so constituting an affirmative defense in an eviction proceeding (Part M § 9); and

e) Permitting evictions to be stayed for up to a year (Part M § 21).

122.   The HSTPA also modifies the RPAPL to make eviction much more difficult and to limit the ability to recover unpaid rents (Part M §§ 11-24), including, *inter alia*:

a) Limiting the amount recoverable in a summary proceeding to the base rent charged "in consideration for the use and occupation of a dwelling" and excluding fees, charges, or penalties (meaning that items such as amenity fees, parking fees, and late fees can only be recovered in a plenary action), notwithstanding any contrary language in the lease (Part M § 11);

b) Increasing the notice period for rent demands to fourteen days (Part M § 12);

c) Providing that a tenant can cure the non-payment and moot a special proceeding by making payment at any time before the petition is heard (Part M § 13);

d) Substantially extending the timeline for summary proceedings by, *inter alia*, facilitating expanded adjournments, while simultaneously limiting the courts' ability to order rent deposits and eliminating default judgment as a remedy for non-compliance with a rent deposit order (Part M § 17); and

e) Requiring the court to vacate an eviction warrant if the tenant pays the full amount of unpaid rent at any time prior to the warrant's execution, unless the **landlord** can establish that the tenant withheld the rent in bad faith, and in all instances limiting eviction to persons specifically named in the warrant, irrespective of whether unnamed occupants were living in the unit unlawfully (Part M §19).

123.   Taken together (and together with the rest of the HSTPA), the Part M amendments further divest property owners of their lawful rights to control the use and possession of their property—or even to enforce the terms of their lease agreements.

124.   For instance, the *per se* ban on consideration of a prospective tenant's history of landlord-tenant disputes—regardless of the basis therefore—effectively injects into the law a presumption that property owners are **required** to let their properties to anyone who applies, even if the applicant has a long history of defaulting on rental payments or violating material lease terms regarding use of the premises—a flagrant curtailment of property owners' right to exclude.

125.   The effects of this categorical prohibition will be especially severe for smaller landlords, such as Plaintiffs, who may not be able to afford to forgo timely rental payments or expend the resources necessary to pursue rent collection and/or eviction proceedings.

126.   This, combined with the other amendments making it harder for property owners to evict tenants and/or collect unpaid rent (and even limiting the size of security deposits, Part M § 25), is just one more instance of the State stripping fundamental ownership rights from property owners and transferring them to rental tenants—exactly what the legislative leaders admit they were trying to do.

### V.       Plaintiffs Are Suffering Under the HSTPA's Unconstitutional Restrictions

127.    All Plaintiffs have been harmed in the manner described above by virtue of the HSTPA's provisions, which independently and cumulatively deprive Plaintiffs of their private property without compensation and violate their rights under the due process, equal protection, and contracts clauses.  Each Plaintiff's property has been drastically devalued by being subjected to the aggregate effect of the unprecedented restrictions and encumbrances imposed by the HSTPA, including but not limited to the specific provisions highlighted in the ensuing subsections.

### A.       Plaintiff G-Max Management, Inc.

128.    As discussed above, Plaintiff G-Max is the owner of 1137 Longfellow Avenue in the Bronx.  This residential apartment building contains eight units, all of which are rent-stabilized.  G-Max has owned 1137 Longfellow Avenue since 2002.  G-Max itself was sold to its current sole shareholder in 2010.

129.    The HSTPA has shattered G-Max's reasonable investment-backed expectations by eliminating the few mechanisms that had previously allowed it to withstand the already-depressed rents imposed by the RSL and keep up with the ever-increasing costs of maintaining the property.  Two apartments became vacant after the amendments took effect in June, and an increase on those vacancy rents would have helped G-Max defray these rising costs.  Instead, G-Max has been forced to defer payment on its water bill in order to reallocate necessary funds elsewhere.

130.    The effects of the new law were particularly damaging in the case of one vacancy that arose after a tenant of eight-plus years skipped out on the rent altogether.  Not only did G-Max lose over $10,000 in rental income to which it was contractually entitled, but it was then unable to recoup a portion of that loss in the form of a vacancy and longevity increase.  Worse

still, by virtue of the HSTPA's new limitation on security deposits and its outright ban on considering an applicant's history of landlord-tenant disputes, G-Max cannot even take proactive measures to protect itself against the exact same thing happening next time around.

131.   G-Max also entered into a preferential rent for a two-year lease that commenced February 1, 2018, less than eighteen months before the HSTPA's enactment.  Without warning, that rent has now been locked into place going forward until the tenant (and any family member successors) decides to vacate her apartment.

132.   Additionally, although 1137 Longfellow Avenue would have been suitable for conversion into cooperatives or condominiums, the HSTPA's new restrictions render such a conversion impossible.

**B.     Plaintiff 1139 Longfellow, LLC**

133.   As discussed above, Plaintiff Longfellow is the owner of 1139 Longfellow Avenue in the Bronx.  This residential apartment building contains eight units, all of which are rent-stabilized.  Longfellow has owned 1139 Longfellow Avenue since 2012.

134.   The HSTPA has shattered Longfellow's reasonable investment-backed expectations by eliminating the few mechanisms that had previously allowed it to withstand the already-depressed rents imposed by the RSL and keep up with the ever-increasing costs of maintaining the property.  One of the apartments in the building became vacant in December 2019, and an increase on the vacancy rent would have helped Longfellow defray these rising costs.  Instead, Longfellow has been forced to defer payment on its water bill in order to reallocate necessary funds elsewhere.

135.   Longfellow also entered into a preferential rent for a two-year lease that commenced May 1, 2018, just over a year before the HSTPA's enactment.  Without warning,

that rent has now been locked into place going forward until the tenant (and any family member successors) decides to vacate his apartment.

136.    Additionally, although 1139 Longfellow Avenue would have been suitable for conversion into cooperatives or condominiums, the HSTPA's new restrictions render such a conversion impossible.

**C.    Plaintiff Green Valley Realty, LLC**

137.    As discussed above, Plaintiff Green Valley is the owner of 26 West 131st Street in Manhattan.  That residential apartment building contains twenty units, all of which are rent-stabilized.  Green Valley has owned 26 West 131st Street since 2005.

138.    The HSTPA has derailed Green Valley's reasonable investment-backed expectations.  For instance, all of the tenants are currently paying preferential rents.  Green Valley began offering these reduced rents when the market was depressed and could not support the full legal regulated rent.  Although Green Valley could have revoked the preferential rents in the years since, it did not do so and instead left them in place over time.  But now, without warning, the HSTPA has locked those rents into place for the duration of the tenancies, effectively punishing Green Valley for ***not*** having increased the rents the moment the market recovered.

139.    Moreover, three apartments in the building have already become vacant since the HSTPA passed in June.  With vacancy increases no longer permitted, Green Valley is deprived of an opportunity to offset a portion of the losses it is forced to absorb on account of the existing preferential rents.

140.    Compounding matters further, Green Valley spent $26,000 to replace all twenty apartment entrance doors—which had not been replaced since 1970—with new fireproof doors in December 2018.  At the time of the HSTPA's passage, Green Valley was in the midst of

taking steps to apply for an MCI increase to recoup a portion of that cost.  Although Green

Valley still intends to submit that application, its recovery will be now be subject to the

HSTPA's limitations on MCI increases—even though the improvements had already been

completed six months earlier, when the former law was still in effect.  Green Valley invested

valuable resources in this building-wide improvement in reliance on that old regime, only to see

its expectations subverted after the fact.  Indeed, given the retroactive application of the new 2%

cap on MCI increases, Green Valley's expectations would have been subverted even if its

application for the increase had been approved prior to June 14, 2019.

141.    Additionally, although 26 West 131st Street would have been suitable for

conversion into cooperatives or condominiums, the HSTPA's new restrictions render such a

conversion impossible.

### D.    Plaintiff 66 East 190 LLC

142.    As discussed above, Plaintiff East is the owner of 66 East 190th Street in the

Bronx.  That residential apartment building contains nineteen units, all of which are rent-

stabilized.  East has owned 66 East 190th Street since 2011.

143.    The HSTPA has derailed East's reasonable investment-backed expectations.  The

nineteen apartments at 66 East 190th Street are all two-bedrooms, and yet the majority of them

rent at less than $1,190/month.  The current tenancies average 16 years in duration.  East

reasonably expected that, as these long-term tenants vacate over time, it would be able to recoup

at least some of the forgone rents in the form of vacancy and longevity increases.  Those

increases also would have helped East cover the ever-increasing costs of items such as taxes,

water, electricity, and insurance, not to mention the costs of maintaining this century-old

building through repairs such as brick work, roof repairs, and electrical work, just to name a few.

144.    Moreover, given the length of the tenancies in question, East has only limited

opportunities to make large-scale improvements to the units without disturbing current tenants.

East thus intended to invest sums well in excess of $15,000 on improving these apartments as

they become vacant—improvements that will be especially important if the next group of

incoming tenants continues the trend of residing in the building for an extended period.

145.    By rendering it economically infeasible for East to undertake meaningful levels of

investment, the HSTPA has effectively frozen the building in its current state, forcing East to

continue bearing the cost of below-market stabilized tenancies without any hope of even partial

relief upon a vacancy, and without the ability to make improvements that would benefit owner

and tenants alike.

### E.    Plaintiff 4250 Van Cortlandt Park East Associates, LLC

146.    As discussed above, Plaintiff Van Cortlandt is the owner of 4250 Van Cortlandt

Park East in the Bronx.  That residential apartment building contains 53 units, all of which are

rent-stabilized.  Van Cortlandt has owned 4250 Van Cortlandt Park East since 1995.

147.    The HSTPA has shattered Van Cortlandt's reasonable investment-backed

expectations by eliminating the few mechanisms that had previously allowed it to withstand the

already-depressed rents imposed by the RSL and the City Rent Control Law and keep up with

the ever-increasing costs of maintaining the property.  For example, taxes, water bills, electric

bills, and insurance premiums continue to rise, and the building requires regular maintenance and

repairs.  Two apartments have become vacant since the HSTPA took effect in June (and a third

unit was already vacant at that time), and an increase on the vacancy rents would have helped

Van Cortlandt defray these rising costs.

148.    Moreover, the two newly vacant apartments were both due for full renovations, as

the previous tenants had resided in them since 1975 and 1980.  Prior to the HSTPA's passage,

Van Cortlandt would have undertaken these renovations and benefitted from a higher (but still below-market) rent upon commencement of the next tenancy—improving the next tenant's quality of life in the near-term, the building's profitability in the mid-term, and the underlying value of the building in the long-term. However, because of the HSTPA's restrictions on IAI increases (both renovations would have cost well over $15,000), combined with the unavailability of vacancy and longevity increases and the need to allocate necessary resources elsewhere, Van Cortlandt was forced instead just to install a new kitchen in one of the units and then put it back on the market in otherwise the same condition in which it has existed for the past 40-plus years. The second apartment has yet to be renovated at all but will similarly receive just the minimum amount of work required to make it rentable, rather than the full renovation it really warrants following a four-decade occupancy.

149.    Additionally, Van Cortlandt had contemplated the future conversion of 4250 Van Cortlandt Park East into cooperatives or condominiums, and believed the building to be suitable for conversion. However, such a conversion is no longer feasible under the HSTPA, given that Van Cortlandt would need to convince 51% of its tenants to enter into purchase agreements for their apartments.

### F.    Plaintiff 181 W. Tremont Associates, LLC

150.    As discussed above, Plaintiff Tremont is the owner of 181 West Tremont Avenue in the Bronx. That residential apartment building contains 37 units, all of which are rent-stabilized. Tremont has owned 181 West Tremont Avenue since 1995.

151.    The HSTPA has derailed Tremont's reasonable investment-backed expectations. The majority of the apartments at 181 West Tremont Avenue rent at less than $960/month, with the current tenancies averaging 16 years in duration. Tremont reasonably expected that, as these long-term tenants eventually vacate, it would be able to recoup at least some of the costs of the

forgone rents in the form of vacancy and longevity increases. Those increases also would have helped Tremont cover the ever-increasing costs of items such as taxes, water, electricity, and insurance, not to mention the costs of maintaining this 1920s building through repairs such as brick work, roof repairs, and electrical work, just to name a few.

152.    Moreover, given the length of the tenancies in question, Tremont has only limited opportunities to make large-scale improvements to the units without disturbing the current tenants. Tremont thus intended to invest sums well in excess of $15,000 on improving these apartments as they become vacant—improvements that will be especially important if the next group of incoming tenants continues the trend of residing in the building for an extended period.

153.    By rendering it economically infeasible for Tremont to undertake meaningful levels of investment, the HSTPA has effectively frozen the building in its current state, forcing Tremont to continue bearing the cost of below-market rent-regulated tenancies without any hope of even partial relief upon a vacancy, and without the ability to make improvements that would benefit owner and tenants alike.

154.    Indeed, one of the units at 181 West Tremont Avenue has already become vacant since the HSTPA passed in June. This one-bedroom apartment, renting at $969/month, had been occupied for over 10 years and was due for a full renovation. Under the old law, Tremont would have spent approximately $20,000 on these much-needed improvements and would have benefitted from a higher (but still below-market) rent upon commencement of the next tenancy— improving the next tenant's quality of life in the near-term, the building's profitability in the mid-term, and the underlying value of the building in the long-term. However, because of the HSTPA's restrictions on IAI increases, combined with the unavailability of vacancy and

longevity increases and the need to allocate necessary resources elsewhere, such renovations are now cost-prohibitive, and the unit will remain vacant and off the market as a result.

### G.    Plaintiff 2114 Haviland Associates, LLC

155.    As discussed above, Plaintiff Haviland is the owner of 2114 Haviland Avenue in the Bronx.  That residential apartment building contains 32 units, all of which are rent-stabilized. Haviland has owned 2114 Haviland Avenue since 1995.

156.    The HSTPA has derailed Haviland's reasonable investment-backed expectations. The majority of the apartments at 2114 Haviland Avenue rent at less than $1,075/month, with the current tenancies averaging 10 years in duration.  Haviland reasonably expected that, as these long-term tenants vacate over time, it would be able to recoup at least some of the forgone rents in the form of vacancy and longevity increases.  Those increases also would have helped Haviland cover the ever-increasing costs of items such as taxes, water, electricity, and insurance, not to mention the cost of maintaining this 1920s building through repairs such as brick work, roof repairs, and electrical work.

157.    Moreover, given the length of the tenancies in question, Haviland has only limited opportunities to make large-scale improvements to the units without disturbing current tenants. Haviland thus intended to invest sums well in excess of $15,000 on improving these apartments as they become vacant—improvements that will be especially important if the next group of incoming tenants continues the trend of residing in the building for an extended period.

158.    By rendering it economically infeasible for Haviland to undertake meaningful levels of investment, the HSTPA has effectively frozen the building in its current state, forcing Haviland to continue bearing the cost of below-market stabilized tenancies without any hope of even partial relief upon a vacancy, and without the ability to make improvements that would benefit owner and tenants alike.

### H.    Plaintiff Siljay Holding LLC

159.    As discussed above, Plaintiff Siljay is the owner of 2105 Burr Avenue in the Bronx.  That residential apartment building contains 59 units, 57 of which are rent-stabilized and two of which are rent-controlled.  Siljay has owned 2105 Burr Avenue since 1995.

160.    The HSTPA has shattered Siljay's reasonable investment-backed expectations by eliminating the few mechanisms that had previously allowed it to withstand the already-depressed rents imposed by the RSL and the City Rent Control Law and keep up with the ever-increasing costs of maintaining the property, which carries a mortgage balance of nearly $2.8 million.  For example, taxes, water bills, electric bills, and insurance premiums continue to rise, and this 1920s building requires regular maintenance such as brick work, roof repairs, and electrical work.  Meanwhile, four rent-stabilized apartments have become vacant since the amendments took effect in June (and a fifth unit was already vacant at that time), and an increase on the vacancy rents would have helped Siljay defray these rising costs, especially now that the two rent-controlled units are subject to the HSTPA's reduced cap on annual rent increases and the prohibition on rent adjustments to account for rising fuel costs.

161.    Moreover, four of the vacant apartments called for renovations that would have cost anywhere from $15,000 to $25,000 to complete.  One of the prior tenancies had spanned nearly two decades.  Prior to the HSTPA's passage, Siljay would have undertaken these renovations and benefitted from a higher (but still below-market) rent upon commencement of the next tenancy—improving the next tenant's quality of life in the near-term, the building's profitability in the mid-term, and the underlying value of the building in the long-term. However, because of the HSTPA's restrictions on IAI increases, combined with the unavailability of vacancy and longevity increases and the need to allocate necessary resources

elsewhere, Siljay was forced instead to do partial (or no) renovations on these vacant units and put them right back on the market.

162.    For instance, one of the vacant units was due for a full renovation that would have cost approximately $20,000.  Siljay instead spent just $2,500 to complete a partial renovation of that unit, replacing a couple appliances, sheetrocking one of the rooms, and doing some electrical repairs.  A second vacant apartment warranted—and previously would have received— approximately $15,000 in work in advance of the incoming tenancy.  That renovation was bypassed altogether, and after a simple paint job the unit was re-rented without any improvements whatsoever.  Even for the vacant apartment that had previously been occupied continuously since 2001, which was due for (and but-for the HSTPA would have received) a full $25,000 renovation, Siljay instead spent approximately $15,000 to do the minimum amount needed to make the apartment livable for the next tenant.

163.    Additionally, Siljay had contemplated the future conversion of 2105 Burr Avenue into cooperatives or condominiums, and believed the building to be suitable for conversion. However, such a conversion is no longer feasible under the HSTPA, given that Siljay would need to convince 51% of its tenants to enter into purchase agreements for their apartments.

### I.    Plaintiff 125 Holding LLC

164.    As discussed above, Plaintiff Holding is the owner of 125 Elliott Avenue in Yonkers.  That residential apartment building contains ninety units, 89 of which are rent-stabilized (including one formerly rent-controlled unit that recently became vacant) and one of which is rent-controlled.  Holding has owned 125 Elliott Avenue since 1995.

165.    The HSTPA has shattered Holding's reasonable investment-backed expectations by eliminating the few mechanisms that had previously allowed it to withstand the already-depressed rents imposed by the ETPA and the State Rent Control Law and keep up with the

ever-increasing costs of maintaining the property, which carries a mortgage balance of nearly $1.5 million. For example, taxes, water bills, electric bills, and insurance premiums continue to rise, and the building requires regular maintenance and repairs.

166.    Indeed, four of the units at 125 Elliott Avenue have already become vacant since the HSTPA passed in June, including one in which the prior family of tenants had resided for 40 years. This large two-bedroom apartment, renting at $768/month, was due for a full renovation, including sheetrocking, flooring, a new bathroom, and a new kitchen. Under the old law, Holding would have spent upwards of $25,000 on these much-needed improvements and would have benefitted from a higher (but still below-market) rent upon commencement of the next tenancy—improving the next tenant's quality of life in the near-term, the building's profitability in the mid-term, and the underlying value of the building in the long-term. However, because of the HSTPA's restrictions on IAI increases, combined with the unavailability of vacancy and longevity increases and the need to allocate necessary resources elsewhere, such renovations are now cost-prohibitive, and the unit will remain vacant and off the market as a result.

167.    Another of the vacant apartments at 125 Elliott Avenue was in need of upwards of $15,000 in renovations. In light of these same cost constraints, however, Holding was unable to complete that work and instead had to re-rent the unit (without even the benefit of a vacancy increase) in essentially the same condition as when the prior tenant moved out.

**J.    Plaintiffs Jane Ordway and Dexter Guerrieri**

168.    As discussed above, Ms. Ordway and Mr. Guerrieri are owners as tenants-in-common of 12 Remsen Street in Brooklyn. This residential apartment building contains eight units, three of which are currently rent-stabilized (although, as explained below, two of those three units are occupied by Ms. Ordway and Mr. Guerrieri and thus are no longer operated as rentals).

169.    Ms. Ordway and Mr. Guerrieri have owned 12 Remsen Street directly, as tenants-in-common, since 2018.  Prior to that, from 2013 through 2018, they owned the building indirectly through a limited liability company they controlled.

170.    At the time of the initial purchase in 2013, six of the eight units in the building were rent-stabilized, including the single unit occupying the second floor and the two units (a garden unit and a street-facing studio) on the first floor.  The building as a whole was in a state of disrepair, both physically and administratively.  Ms. Ordway and Mr. Guerrieri therefore devoted considerable time and resources to turning it around.  Among other things, they replaced the boiler, patched the roof, and installed a second water heater.  They also made apartment-level improvements, such as new kitchens, floors, and bathrooms, as units became vacant.  Although they filed for IAI increases to recover the costs of the vacancy-stage improvements, they never sought MCI increases that would have been passed on to existing tenants.  Instead, they relied on bank financing to absorb those costs themselves.  And they cleaned up the building's recordkeeping, identifying tenants who had been overcharged by the prior owner, refunding those overages, and reducing the affected tenants' rents accordingly.

171.    In 2016, Ms. Ordway and Mr. Guerrieri decided to move into 12 Remsen Street.  The tenant on the second floor had passed away and his roommate voluntarily moved out, and the tenant in the street-facing studio on the first floor voluntarily moved out as well.  Ms. Ordway and Mr. Guerrieri were therefore able to move into those units in 2017, with the second floor serving as a living area and the first-floor studio serving as a bedroom.  Relying on the RSL provision allowing owners to recover their units for personal use and occupancy upon expiration of the existing lease (N.Y.C. Admin. Code § 26-511(c)(9)(b)), Ms. Ordway and Mr. Guerrieri intended to recover the garden unit on the first floor so that they could consolidate the two floors

into a home where they could reside long-term.  They chose the first two floors of the building

for a number of reasons, including because it would minimize the number of stairs they need to

climb as they get older—Ms. Ordway is 63, and Mr. Guerrieri is 64—and because they could

utilize the garden area on the first floor while also allowing their dogs to spend time outside

without having to be taken off the property.

172.    The lease for the rent-stabilized garden unit was set to expire on August 15, 2018.

Confident that the current occupant—a successful businessman and professional athlete who also

holds an adjunct professorship at NYU—could easily afford an apartment elsewhere, Ms.

Ordway and Mr. Guerrieri served him with a lawful notice of non-renewal on May 11, 2018.

The tenant, however, refused to move out.  Given that there was no genuine dispute that they

satisfied all of the criteria to reclaim the unit for personal use, Ms. Ordway and Mr. Guerrieri

commenced owner-occupancy holdover proceedings in Brooklyn housing court on September

17, 2018.  Because they could not complete their consolidation efforts until the holdover

proceedings were resolved, the units were never combined, and thus at the end of each night Ms.

Ordway and Mr. Guerrieri have to walk through the common area of the building to access their

bedroom.

173.    By June 2019, the holdover proceedings had progressed beyond the halfway

mark, with trial likely to commence before the end of 2019.  But then, just as Ms. Ordway and

Mr. Guerrieri were about to lawfully reclaim occupancy of their own private property, the

HSTPA forced an abrupt end to the proceedings and derailed three years of long-term planning.

By introducing a new duration-of-tenancy exception to the RSL's personal use and occupancy

provision (which covered the tenant in question) and imposing an onerous new "immediate and

compelling necessity" standard—and in neither case providing an exception for owners who

were already midway through the reclamation process—the HSTPA effectively nullified the lawful notice of non-renewal that Ms. Ordway and Mr. Guerrieri had served thirteen months previously and stopped their consolidation efforts in their tracks.

174.    This outcome is problematic for Ms. Ordway and Mr. Guerrieri on multiple fronts:  their prior home has been renovated and subdivided into separate rental units, so they cannot move back and instead must continue living in two non-consolidated apartments separated by a public hallway.  And it yields a near-term dilemma because their son is due to graduate college in May 2020, and Ms. Ordway and Mr. Guerrieri had intended to let him live with them temporarily while he gets himself situated in his first year out of school, an arrangement that will now be significantly more complicated given the unexpected shortage of functional living space.

175.    The HSTPA has thus deprived Ms. Ordway and Mr. Guerrieri of their fundamental right to occupy their own private property, subjecting them to the whims of an affluent tenant who can now (together with his successors) continue demanding renewal leases in perpetuity—even though he was served with a lawful notice of non-renewal more than a full year *before* the HSTPA changed the rules of the game.  Ms. Ordway and Mr. Guerrieri have quite literally been excluded from their own property, simply because their preexisting holdover proceedings happened not to have been fully resolved before June 14, 2019.

176.    Adding insult to injury, because the unit in question was the last rent-regulated, non-owner-occupied apartment within an otherwise-free-market property, the HSTPA has also compromised the underlying asset value of the building—a building Ms. Ordway and Mr. Guerrieri have expended significant time and energy working to improve, and in which they had hoped to retire.  This, in turn, negatively affected the terms of Ms. Ordway and Mr. Guerrieri's

recent refinancing and thus adversely impacts their ability to fund necessary capital improvements going forward.

### K.      Plaintiff Brooklyn 637-240 LLC

#### 1.      637 Henry Street

177.    As discussed above, Plaintiff Brooklyn is the owner of 637 Henry Street in Brooklyn.  That residential apartment building contains eight units, three of which are rent-stabilized and one of which is rent-controlled.

178.    Brooklyn has owned 637 Henry Street since 2012.  At that time, six of the eight units were rent-stabilized and two were rent-controlled.  Brooklyn purchased the building with the reasonable expectation that, over time, these regulated units would shift toward deregulation and eventually return to the free market, consistent with the stated intent of the rent-regulation statutes.

179.    For seven years, the system worked precisely as it was designed to:  Brooklyn invested significant sums into improving the quality of the building, including by renovating individual apartments as vacancies arose.  Incoming tenants benefitted from this modernization (which in some instances included full gut-renovations of apartments that were essentially unlivable and unmarketable in their current condition), while Brooklyn was compensated with lawful increases in the regulated rents—increases that would be borne by those incoming tenants but that had absolutely no impact on existing tenants.  Such IAI increases, along with other lawful increases permitted under the pre-HSTPA regime, gradually resulted in apartments at 637 Henry Street exceeding the then-operative threshold for high-rent vacancy decontrol.

180.    Now, however, the HSTPA has entirely subverted Brooklyn's reasonable expectations by trapping the four remaining rent-regulated units under a perpetual system of government control and below-market rents, significantly impairing the value of Brooklyn's

property.  And Brooklyn, no longer able to recoup its improvement costs in the form of
reasonable IAI increases or to otherwise offset those costs via vacancy or longevity bonuses, will
have to forgo making improvements that would have benefitted incoming tenants.  As the units
continue to deteriorate over time, Brooklyn will eventually have no choice but to take them off
the market altogether.

181.    Additionally, Brooklyn had contemplated the future conversion of 637 Henry
Street into cooperatives or condominiums, and believed the building to be suitable for
conversion.  However, such a conversion is no longer feasible under the HSTPA, given that
Brooklyn would need to convince 51% of its tenants to enter into purchase agreements for their
apartments.

### 2.    240 President Street

182.    As discussed above, Plaintiff Brooklyn is also the owner of 240 President Street
in Brooklyn.  That residential apartment building contains eight units, two of which are rent-
stabilized and one of which is rent-controlled.

183.    Brooklyn has owned 240 President Street since 2012.  At that time, six of the
eight units were rent-stabilized and two were rent-controlled.  Brooklyn purchased the building
with the reasonable expectation that, over time, these regulated units would shift toward
deregulation and eventually return to the free market, consistent with the stated intent of the rent-
regulation statutes.

184.    For seven years, the system worked precisely as it was designed to:  Brooklyn
invested significant sums into improving the quality of the building, including by renovating
individual apartments as vacancies arose.  Incoming tenants thereby benefitted from this
modernization (which in some instances included full gut-renovations of apartments that were
essentially unlivable and unmarketable in their current condition), while Brooklyn was

compensated with lawful increases in the regulated rents—increases that would be borne by those incoming tenants but that had absolutely no impact on existing tenants. Such IAI increases, along with other lawful increases permitted under the pre-HSTPA regime, gradually resulted in apartments at 240 President Street exceeding the then-operative threshold for high-rent vacancy decontrol.

185.    Now, however, the HSTPA has entirely subverted Brooklyn's reasonable expectations by trapping the three remaining rent-regulated units under a perpetual system of government control and below-market rents, significantly impairing the value of Brooklyn's property. And Brooklyn, no longer able to recoup its improvement costs in the form of reasonable IAI increases or to otherwise offset those costs via vacancy or longevity bonuses, will have to forgo making improvements that would have benefitted incoming tenants. As the units continue to deteriorate over time, Brooklyn will eventually have no choice but to take them off the market altogether.

186.    Additionally, Brooklyn had contemplated the future conversion of 240 President Street into cooperatives or condominiums, and believed the building to be suitable for conversion. However, such a conversion is no longer feasible under the HSTPA, given that Brooklyn would need to convince 51% of its tenants to enter into purchase agreements for their apartments.

### L.    Plaintiff 447-9 16th LLC

#### 1.    447 16th Street

187.    As discussed above, Plaintiff Sixteenth is the owner of 447 16th Street in Brooklyn. That residential apartment building contains eight units, five of which are rent-stabilized.

188.    Sixteenth has owned 447 16th Street since 2012.  At that time, all eight units were rent-stabilized.  Sixteenth purchased the building with the reasonable expectation that, over time, these units would shift toward deregulation and eventually return to the free market, consistent with the stated intent of the rent-regulation statutes.

189.    For seven years, the system worked precisely as it was designed to:  Sixteenth invested significant sums into improving the quality of the building, including by renovating individual apartments as vacancies arose.  Incoming tenants thereby benefitted from this modernization (which in some instances included full gut-renovations of apartments that were essentially unlivable and unmarketable in their current condition), while Sixteenth was compensated with lawful increases in the regulated rents—increases that would be borne by those incoming tenants but that had absolutely no impact on existing tenants.  Such IAI increases, along with other lawful increases permitted under the pre-HSTPA regime, gradually resulted in apartments at 447 16th Street exceeding the then-operative threshold for high-rent vacancy decontrol.

190.    Now, however, the HSTPA has entirely subverted Sixteenth's reasonable expectations by trapping the five remaining rent-regulated units under a perpetual system of government control and below-market rents, significantly impairing the value of Sixteenth's property.  And Sixteenth, no longer able to recoup its improvement costs in the form of reasonable IAI increases or to otherwise offset those costs via vacancy or longevity bonuses, will have to forgo making improvements that would have benefitted incoming tenants.  As the units continue to deteriorate over time, Sixteenth will eventually have no choice but to take them off the market altogether.

191.    Additionally, Sixteenth had contemplated the future conversion of 447 16th Street into cooperatives or condominiums, and believed the building to be suitable for conversion. However, such a conversion is no longer feasible under the HSTPA, given that Sixteenth would need to convince 51% of its tenants to enter into purchase agreements for their apartments.

### 2.    449 16th Street

192.    As discussed above, Plaintiff Sixteenth is also the owner of 449 16th Street in Brooklyn.  That residential apartment building contains eight units, four of which are rent-stabilized.

193.    Sixteenth has owned 449 16th Street since 2012.  At that time, seven of the eight units were rent-stabilized.  The eighth was a free-market unit.  Sixteenth purchased the building with the reasonable expectation that, over time, the remaining regulated units would shift toward deregulation and eventually return to the free market, consistent with the stated intent of the rent-regulation statutes.

194.    For seven years, the system worked precisely as it was designed to:  Sixteenth invested significant sums into improving the quality of the building, including by renovating individual apartments as vacancies arose.  Incoming tenants thereby benefitted from this modernization (which in some instances included full gut-renovations of apartments that were essentially unlivable and unmarketable in their current condition), while Sixteenth was compensated with lawful increases in the regulated rents—increases that would be borne by those incoming tenants but that had absolutely no impact on existing tenants.  Such IAI increases, along with other lawful increases permitted under the pre-HSTPA regime, gradually resulted in apartments at 449 16th Street exceeding the then-operative threshold for high-rent vacancy decontrol.

195.    Now, however, the HSTPA has entirely subverted Sixteenth's reasonable expectations by trapping the four remaining rent-regulated units under a perpetual system of government control and below-market rents, significantly impairing the value of Sixteenth's property.  And Sixteenth, no longer able to recoup its improvement costs in the form of reasonable IAI increases or to otherwise offset those costs via vacancy or longevity bonuses, will have to forgo making improvements that would have benefitted incoming tenants.  As the units continue to deteriorate over time, Sixteenth will eventually have no choice but to take them off the market altogether.

196.    Additionally, Sixteenth had contemplated the future conversion of 449 16th Street into cooperatives or condominiums, and believed the building to be suitable for conversion. However, such a conversion is no longer feasible under the HSTPA, given that Sixteenth would need to convince 51% of its tenants to enter into purchase agreements for their apartments.

## VI.    The Pre-Existing "Hardship" Provisions in the Rent-Regulation Statutes Provide No Relief from, and Instead Are Further Undermined by, the HSTPA

197.    The "hardship" provisions in the various rent-control and rent-stabilization statutes cannot cure the takings alleged herein, as those exceptions do not provide *any* relief from the facial requirements of the HSTPA— requirements that indisputably apply with full force to Plaintiffs' properties.

198.    These hardship provisions allow DHCR to provide owners with individualized rent increases if certain statutory criteria are satisfied.  *See* N.Y.C. Admin. Code §§ 26-405(g), 26-511(c)(6)-(6-a); 23 N.Y. Unconsol. Law §§ 8584(4), 8626(d)(4)-(5).  But the takings here are not tied to a simple loss of rental income.  Instead, they involve wide-ranging divestments of core property rights paired with regulatory restrictions that so devalue the subject properties as to mirror outright governmental appropriations.  DHCR has absolutely *no* discretion to waive or

modify the HSTPA's application to a given property, and thus no discretion to cure the takings alleged herein. Even in the rare instance where DHCR grants a hardship application, a modest increase in the rent does nothing to override tenants' newly conferred veto rights over co-op/condo conversion plans, to restore owners' rights to reclaim units for personal use and occupancy, or to free units from the strictures of rent-regulation once the rent exceeds the prior threshold for vacancy or high-income decontrol. Indeed, some of the burdens imposed by the HSTPA—such as the co-op/condo conversion restrictions and the amendments to the eviction and rental application procedures—are not even contained in the rent-regulation statutes that house the hardship provisions.

199.   Moreover, because all of the hardship provisions predate the passage of the HSTPA, pre-amendment property values already necessarily accounted for the possibility of one-off rent increases under those provisions. The onerous new encumbrances and concomitant devaluations detailed herein are therefore grafted on top of, and cannot be offset by, these preexisting hardship provisions.

200.   If anything, the HSTPA *blunts* the force of those provisions. For instance, the alternative hardship provisions in the RSL and ETPA are keyed to profit margins and yet exclude capital repairs (and income taxes) from the calculation of operating expense, meaning that the value of any rent increase secured under those provisions will be diminished by the owner's capital improvement costs, which must be recouped separately via MCI increases. However, by significantly limiting MCI increases (even retroactively), the HSTPA has rendered the alternative hardship provisions' purported protections even more illusory than they already were. Similarly, these alternative hardship provisions impute rental value to apartments "unoccupied at the owner's choice." As detailed above, however, the repeal of vacancy and longevity increases and

the new restrictions on IAIs effectively leave owners with no choice but to leave units vacant, a "choice" that would count against them for purposes of an alternative hardship application.

201.    In any event, even looking just at rental income and assuming that an owner were to receive the maximum relief available under the hardship provisions, that owner would still suffer an unconstitutional taking.  That is because the hardship provisions, which are subject to various caps and restrictions on how often an owner can apply for an increase, are not available at all until the situation becomes so dire that the taking has already occurred.

202.    By way of illustration, the RSL's "comparative hardship" provision (N.Y.C. Admin. Code § 26-511(c)(6)) essentially guarantees annual net income at *1968-1970* levels, with no adjustment for inflation, no exception for buildings that were not profitable during the benchmark period, and exclusive of debt service, financing costs, or management fees—and the owner must operate at those levels for three years before the purported "remedy" is even available.  Of course, an owner's reasonable investment-backed expectations are destroyed, and his or her building is substantially devalued, well before net income drops to 1960s levels over three years.

203.    The ETPA's comparative hardship provision (23 N.Y. Unconsol. Law § 8626(d)(4)) is keyed to the average ratio between operating expenses and gross rents over the proceeding five years—again without regard for whether the building was profitable during that period, and again exclusive of debt service, financing costs, or management fees—and only applies once the owner can affirmatively "establish[] a hardship."

204.    Both rent-stabilization statutes' alternative hardship provisions (N.Y.C. Admin. Code § 26-511(c)(6-a); 23 N.Y. Unconsol. Law § 8626(d)(5)) are equally infirm, as they only

become available if gross margins dip below **5%**, exclusive of capital improvement costs and income taxes.

205.    The hardship provisions in the two rent-control statutes (N.Y.C. Admin. Code § 26-405(g); 23 N.Y. Unconsol. Law § 8584(4)) purport to guarantee a net annual return—exclusive of mortgage interest—equal to 7.5% (outside the City) or 8.5% (in the City) of the valuation of the subject property, but they do ***not*** override the general cap on rent increases for rent-controlled apartments.  Thus, by virtue of the amendments in Part H of the HSTPA (discussed above), hardship increases for rent-controlled units are now capped by the five-year average of rent guidelines board increases (with any shortfall deferred to future years)—a circular outcome given that the overwhelming majority of rent-regulated units (including in the buildings owned by Plaintiffs Siljay, Holding, and Brooklyn at issue here) are stabilized, not controlled, and thus the majority of the units will already have been subject to those below-market increases at the time the building became distressed.  The only exception to the cap, within New York City, allows buildings operating at a net loss to be brought back to zero—but owners reasonably expect to do more than just break even.  Worse still, by impairing the underlying asset value of the buildings, the HSTPA has reduced the very metric used to calculate the size of this purported hardship increase, which would only affect rents for the tiny minority of rent-controlled units anyway.

206.    With their buildings now trapped in a perpetual regulatory scheme that deprives them of core property rights, it is of little comfort to owners that they can periodically ask the government for the equivalent of a handout ***after*** that taking has already occurred.

207.     Thus, the preexisting hardship provisions provide, at best, a modest and much-too-late increase in rental income that does nothing at all to address the underlying encumbrances imposed on Plaintiffs' property via the newly enacted HSTPA.

## VII.   The HSTPA Disparately and Adversely Impacts Racial and Ethnic Minority Renters and Perpetuates Residential Segregation in New York

208.     As detailed in a June 12, 2019 *Wall Street Journal* article, wealthy, white Manhattan residents have enjoyed disproportionate benefits under New York's rent-control and rent-stabilization laws, even pre-HSTPA.

209.     Citing statistics from the 2017 New York City Housing and Vacancy Survey, the article explains that "[w]hite renters in rent-protected apartments benefited more than any other race group, . . . with a discount of 36% from market rates, compared with 16% for black renters and 17% for Hispanic renters."

210.     These disparate impacts, by effectively freezing tenants in place, perpetuate residential racial segregation among New York City communities, as the decreased incentives for turnover in the housing market limit the opportunities for members of different racial and ethnic groups to compete for housing in heavily regulated communities—and especially in the wealthy, majority-white neighborhoods where the market-distorting effects of rent regulation are at their zenith.

211.     For the reasons discussed above, these unlawful effects will only worsen under the HSTPA, which permanently locks into place, and exacerbates, a system that disproportionately benefits wealthier white tenants more than it benefits members of any other racial or ethnic group.  Indeed, the repeal of the income cap effectively guarantees that those very same tenants and their families can now retain their rent-regulated apartments in perpetuity.

212.    As members of minority groups are denied the opportunity to compete in the rental market for those apartments in which white renters will now be effectively permanently ensconced, all citizens—owners and tenants alike—will be denied the benefits of more racially diverse buildings and neighborhoods.

## FIRST CAUSE OF ACTION
### Taking Without Just Compensation – Fifth Amendment; 42 U.S.C. § 1983
### (Against All Defendants)

213.    Plaintiffs repeat and reallege each and every allegation of this Complaint as if fully set forth herein.

214.    The takings clause of the Fifth Amendment to the United States Constitution, incorporated against the States by the Fourteenth Amendment, provides:  "[N]or shall private property be taken for public use, without just compensation."

215.    Acting under color of state law, Defendants have caused, and will continue to cause, landlord owners (including Plaintiffs) to be deprived of their right to possess, use, and dispose of their property, and have taken their private property for a claimed public use without just compensation in violation of the federal takings clause, both facially and as applied to Plaintiffs.

216.    The HSTPA constitutes a taking for at least two independent reasons, based on at least two separate legal theories.

217.    *First*, the HSTPA deprives owners of their fundamental rights to possess, use, admit or exclude others, and dispose of their property.  Accordingly, Defendants have effected an unconstitutional physical taking of private property without any (let alone just) compensation.

218.    Among other things, by virtue of the amendment to the co-op/condo conversion rules, property owners are now quite literally forced to secure majority tenant consent in order to dispose of their property and exit the rental business via a conversion.  That is, the right to

dispose (and control the use) of their property is transferred to their tenants, who are effectively elevated to the status of equity stakeholders in the subject properties.  And by removing the sunset provision on this conversion restriction, Defendants have now ***permanently*** abrogated one of the core ownership rights in the bundle associated with property ownership, inexplicably transferring that right to non-owners.

219.    Similarly, by severely restricting property owners' ability to reclaim possession of their rent-regulated units even for ***personal use***, Defendants have cut at the very core of owners' rights to control the possession and use of their own property.

220.    The HSTPA thereby permanently abrogates or substantially impairs Plaintiffs' basic rights to possess, use, and dispose of their buildings in the manner set forth above.  Such a permanent abrogation of at least one of the overall bundle of property rights constitutes a taking, without regard to its comparative value in relation to the whole.

221.    Because the government has effected a physical taking, it has a categorical duty to provide just compensation to Plaintiffs, regardless of whether the interest that is taken constitutes an entire parcel or merely a part thereof, no matter how large or small of a portion of the whole is taken, and no matter how large or small the economic impact.

222.    *Second*, the HSTPA "goes too far and effects a regulatory taking" based on an array of case-specific factors, including, but not limited to, the statute's "economic effect on the landowner[s], the extent to which the regulation interferes with reasonable investment-backed expectations, and the character of the government action," that together establish that justice and fairness require that the economic injuries caused by the HSTPA be compensated by the government, rather than remain disproportionately borne by the owners of rent-regulated buildings (and, in the case of the co-op/condo conversion restrictions and the changes to the

landlord-tenant laws, owners of even market-rate buildings) without just compensation. *Palazzolo*, 533 U.S. at 617 (citing *Penn Central*, 438 U.S. at 124).

223. The regulatory takings analysis eschews any set formula, requires careful examination and weighing of all relevant circumstances in context, and depends largely on the particular impacts of the statute at issue.

224. Through the HSTPA, Defendants have imposed unduly harsh economic impacts on Plaintiffs' use of their properties. These impacts include dramatically devaluing Plaintiffs' properties; rendering their investments in the properties unprofitable; rendering the ongoing business of renting out the rent-regulated units in Plaintiffs' properties unprofitable; making it commercially impracticable and economically unviable to continue to rent out certain rent-regulated units; and interfering with Plaintiff's legitimate property interests in the ways set forth above.

225. Defendants have also interfered with Plaintiffs' reasonable investment-backed expectations in those properties. This interference is to such a degree that Defendants' actions are the functional equivalent of a government appropriation, again without just compensation.

226. Owners have purchased and invested in properties with reasonable investment-backed expectations that they would be able to recoup and profit to a reasonable degree from their investments, and run their buildings profitability, based on, *inter alia*, a certain percentage of units coming off rent regulation over time, certain specific formerly permitted increases in rent, reasonable recoupment of MCI investments through permanently increased rents at the previously permitted rent increase levels, the ability to convert buildings to cooperatives and condominiums under the previously applicable rules, and the like. Indeed, as the express terms of the rent-regulation statutes make clear, this trend toward deregulation was the fundamental

bargain struck between owners and the government upon which owners relied in purchasing buildings with rent-regulated units.

227.   Given that owners already had to compensate for the market-distorting effects of rent-regulation (such as perpetual renewal and succession rights) under the pre-amendment regime, the imposition of these draconian new restraints on owners' rights obliterates what little recourse owners had left and makes it impossible for them to realize any sort of reasonable return or profit on their investments, which in turn compromises the underlying asset resale value of their properties and destroys their reasonable investment-backed expectations of profitability and appreciating asset value.

228.   The HSTPA accomplishes this devaluation by, *inter alia*, limiting owners' ability to remove rental units from rent regulation by repealing the high-rent deregulatory provisions; limiting owners' ability to raise rents upon a vacancy; curtailing owners' ability to raise rents to recover the costs of MCIs and IAIs, including those IAIs required simply to keep a unit in the rental market at all following a lengthy tenancy; applying the new limitations on owners' ability to raise rents to recover the costs of MCIs retroactively to MCI investments approved since 2012; prohibiting owners from renewing leases at the legal regulated rent after having previously offered a lower "preferential" rent; effectively destroying owners' ability to dispose of or otherwise recover their investments in rent-regulated buildings via a conversion (especially given the economic incentives for regulated tenants not to purchase their units); depriving owners of the ability to select their incoming tenants or obtain adequate security to protect their legitimate property interests; and even denying owners the right to reclaim occupancy for their own personal use.

229.     Indeed, by repealing the various deregulatory provisions and severely curtailing lawful rent increases—and by repealing the sunset provisions that had previously required the Legislature to periodically revisit the supposed need for rent regulation—the HSTPA has created a self-perpetuating regulatory regime that will disincentivize tenants from vacating their apartments and thereby exacerbate the purported housing "emergency" that supposedly justified regulation in the first place.  In doing so, the HSTPA effectively guarantees that owners' private property will remain subject to rent-regulation in perpetuity.

230.     Defendants have thereby forced certain private property owners to bear the cost (without a corresponding benefit) of what is essentially a government-sponsored affordable housing initiative that, in fairness and justice, should be funded, if at all, by the public as a whole.  The character of this governmental action—which eviscerates owners' fundamental rights to dispose of, exclude others from, and personally use and possess their own property (and does so in perpetuity), and which in the case of the co-op/condo conversion restrictions applies even to fully market-rate buildings—confirms that this "regulation" is in fact an unconstitutional regulatory taking of private property.

231.     In the absence of declaratory and injunctive relief, landlord owners (including Plaintiffs) will continue to be irreparably harmed and subjected to the deprivation of rights guaranteed to them by the U.S. Constitution.

232.     In the alternative, Plaintiffs are entitled to just compensation.

## SECOND CAUSE OF ACTION
### Taking Without Just Compensation – N.Y. Const. art. I, § 7
### (Against All Defendants Except the State, the AG, Visnauskas, and Pascal)

233.     Plaintiffs repeat and reallege each and every allegation of this Complaint as if fully set forth herein.

234.     The takings clause of Article I, § 7 of the New York State Constitution provides that "[p]rivate property shall not be taken for public use without just compensation."

235.     Acting under color of state law, Defendants have caused, and will continue to cause, landlord owners (including Plaintiffs) to be deprived of their right to possess, use, and dispose of their property, and have taken their private property for a claimed public use without just compensation in violation of the State takings clause, both facially and as applied to Plaintiffs.

236.     The HSTPA constitutes a taking at least for the two independent reasons, based on at least two separate legal theories, set forth above, and also because it does not substantially advance a closely and legitimately connected government interest.  As detailed above, the means employed by the HSTPA directly undermine, rather than advance, the law's purported goal of increasing or preserving affordable housing in New York and will perpetuate, rather than alleviate, the purported vacancy "emergency."

237.     In the absence of declaratory and injunctive relief, landlord owners (including Plaintiffs) will continue to be irreparably harmed and subjected to the deprivation of rights guaranteed to them by the New York State Constitution.

238.     In the alternative, Plaintiffs are entitled to just compensation.

### THIRD CAUSE OF ACTION
**Substantive Due Process – Fourteenth Amendment; 42 U.S.C. § 1983**
**(Against All Defendants Except the State)**

239.     Plaintiffs repeat and reallege each and every allegation of this Complaint as if fully set forth herein.

240.     The due process clause of the Fourteenth Amendment to the United States
Constitution provides:  "[N]or shall any State deprive any person of life, liberty, or property,
without due process of law."

241.     Owners, including Plaintiffs, have a legitimate property interest, grounded in state
law, in the buildings they own.

242.     The HSTPA infringes upon the property rights of owners, including Plaintiffs, in
an arbitrary manner, without any conceivable rational basis, and is impermissibly retroactive.  In
addition, the HSTPA does not substantially advance legitimate state interests, and does not
accomplish its stated objective, for the reasons alleged above.

243.     Indeed, the law is irrational and arbitrary on its face, as evidenced by, *inter alia*,
(1) its repeal of the income cap for rent-regulated apartments with rents above a certain
threshold, which transforms a law ostensibly aimed at providing affordable housing to low-
income New Yorkers into one that will allow ***high***-income tenants (and their family members, as
broadly defined) to benefit indefinitely from the regime; (2) its repeal of provisions that allowed
units to be removed from rent stabilization or control once the rent crossed a statutory high-rent
threshold and the unit became vacant; (3) its repeal of provisions permitting larger rent increases
for a new tenant after a vacancy; (4) its modification of the preferential rent provisions such that
owners who voluntarily agreed to a further-reduced rent in the past (even before the HSTPA took
effect) cannot even charge the government-approved legal regulated rent upon renewal; (5) its
lowering of the rent increase cap for MCIs from 6% to just 2% in rent-stabilized apartments in
New York City, from 15% to 2% in rent-controlled apartments in New York City, and from 15%
to 2% in other counties when landlords make MCIs (and its elimination of such increases after
30 years); (6) its retroactive application of these MCI rent increase caps to rent increases

attributable to MCIs that were approved within the seven years *prior* to the amendment taking

effect; (7) its outright elimination of MCIs for buildings with 35% or fewer rent-regulated units;

(8) its cap of $15,000 over 15 years on recoverable IAI spending—spread across a maximum of

just three IAIs and with no exception for property owners whose units are not in a rentable state

following a prolonged tenancy—combined with a drastic reduction in the size of the monthly

rent increases available to recover those costs (and the outright elimination of such increases

after 30 years); (9) its restrictions on evicting tenants who do not pay their rent, potentially

extending their tenancies for up to a year; (10) its curtailment of owners' rights to reclaim

possession of their units for personal use and occupancy (even if the owners took steps to

lawfully reclaim their units prior to the HSTPA's effective date); (11) its retroactive expansion of

the limitations, record-retention, and lookback periods for rent overcharge claims; and (12) its

imposition of substantial new restrictions on co-op/condo conversions, conferring blocking rights

on existing tenants even when the conversion would *not* cause those tenants to be evicted (and

even when the building in question is not rent-regulated).

    244.    These changes freeze the existing stock of rent-regulated apartments in place and

disincentivize tenants from giving up their apartments and moving in and out of apartments,

neighborhoods, and the City as market conditions shift, because units will be permanently rent-

regulated at rents far below market price, and because it will be too expensive for developers to

build new units, decreasing the availability of affordable housing.

    245.    Indeed, by virtue of the repeals of the high-rent vacancy and high-income

provisions, renewal rights to a rent-regulated apartment will remain vested no matter how high

the rent gets or how wealthy the tenant becomes.  When tacked onto the preexisting features of

the rent-regulation regime (such as the rights of co-tenants/family members who take over rent-

regulated apartments from a deceased tenant), this effectively creates renewal rights in perpetuity, which in turn will necessarily exacerbate—not alleviate—the purported housing "emergency."

246.　Moreover, by repealing the sunset provisions that had previously required the Legislature to periodically reassess the purported wisdom and efficacy of the rent-regulation regime in light of changed circumstances over time, the HSTPA cements the disconnect between the now-permanent law and the purported "emergency" it was ostensibly designed to address, thereby exacerbating the due process violation.

247.　Acting under color of state law, Defendants have caused, and will continue to cause, landlord owners (including Plaintiffs) to be deprived of their property without due process in violation of their substantive due process rights under the Fourteenth Amendment, both facially and as applied to Plaintiffs.

248.　In the absence of declaratory and injunctive relief, landlord owners (including Plaintiffs) will continue to be irreparably harmed and to be subjected to this deprivation of rights guaranteed to them by the United States Constitution.

### FOURTH CAUSE OF ACTION
### Substantive Due Process – N.Y. Const. art. I, § 6
### (Against All Defendants Except the State, the AG, Visnauskas, and Pascal)

249.　Plaintiffs repeat and reallege each and every allegation of this Complaint as if fully set forth herein.

250.　The due process clause of Article I, § 6 of the New York State Constitution provides that "[n]o person shall be deprived of life, liberty or property without due process of law."

251.　Owners, including Plaintiffs, have a legitimate property interest, grounded in state law, in the buildings they own.

252.     The HSTPA infringes upon the property rights of owners, including Plaintiffs, in an irrational and arbitrary manner, without any conceivable rational basis, and is impermissibly retroactive, as set forth above.

253.     Acting under color of state law, Defendants have caused, and will continue to cause, landlord owners (including Plaintiffs) to be deprived of their property without due process, in violation of their substantive due process rights under Article I, § 6 of the New York State Constitution, both facially and as applied to Plaintiffs.

254.     In the absence of declaratory and injunctive relief, landlord owners (including Plaintiffs) will continue to be irreparably harmed and to be subjected to this deprivation of rights guaranteed to them by the New York State Constitution.

## FIFTH CAUSE OF ACTION
### Equal Protection – Fourteenth Amendment; 42 U.S.C. § 1983
### (Against All Defendants Except the State)

255.     Plaintiffs repeat and reallege each and every allegation of this Complaint as if fully set forth herein.

256.     The equal protection clause of the Fourteenth Amendment to the United States Constitution provides:  "[N]or [shall any State] deny to any person within its jurisdiction the equal protection of the laws."

257.     The HSTPA singles out building owners whose properties happen to include rent-regulated units (and single-unit owners in converted co-ops/condos who purchased a unit subject to a regulated tenancy), including Plaintiffs, for oppressive treatment that, as detailed above, bears no rational relationship to the goal of providing affordable housing (and yet has now been made permanent).

258.     Acting under color of state law, Defendants have caused, and will continue to cause, landlord owners (including Plaintiffs) to be deprived of their right to equal protection guaranteed by the Fourteenth Amendment, both facially and as applied to Plaintiffs.

259.     In the absence of declaratory and injunctive relief, landlord owners (including Plaintiffs) will continue to be irreparably harmed and to be subjected to this deprivation of rights guaranteed to them by the United States Constitution.

**SIXTH CAUSE OF ACTION**
**Equal Protection Clause – N.Y. Const. art. I, § 11**
**(Against All Defendants Except the State, the AG, Visnauskas, and Pascal)**

260.     Plaintiffs repeat and reallege each and every allegation of this Complaint as if fully set forth herein.

261.     The equal protection clause of Article I, § 11 of the New York State Constitution provides that "[n]o person shall be denied the equal protection of the laws of this state or any subdivision thereof."

262.     The HSTPA singles out building owners whose properties happen to include rent-regulated units (and single-unit owners in converted co-ops/condos who purchased a unit subject to a regulated tenancy), including Plaintiffs, for oppressive treatment that, as detailed above, bears no rational relationship to the goal of providing affordable housing (and yet has now been made permanent).

263.     Acting under color of state law, Defendants have caused, and will continue to cause, landlord owners (including Plaintiffs) to be deprived of their right to equal protection guaranteed by the New York State Constitution, both facially and as applied to Plaintiffs..

264.     In the absence of declaratory and injunctive relief, landlord owners (including Plaintiffs) will continue to be irreparably harmed and to be subjected to this deprivation of rights guaranteed to them by the New York State Constitution.

71

## SEVENTH CAUSE OF ACTION
### Contracts Clause – Article I, § 10; 42 U.S.C. § 1983
### (Against All Defendants Except the State)

265.    Plaintiffs repeat and reallege each and every allegation of this Complaint as if fully set forth herein.

266.    The contracts clause of Article I, § 10 of the United States Constitution provides that "[n]o State shall . . . pass any . . . Law impairing the Obligation of Contracts."

267.    Acting under color of state law, Defendants have caused, and will continue to cause, landlord owners (including Plaintiffs) to be deprived of their rights guaranteed by the contracts clause, both facially and as applied to Plaintiffs.

268.    Specifically, the HSTPA has substantially impaired existing contractual relationships, including but not limited to by:

    a)  making existing preferential rents the base rent for lease renewal increases, irrespective of the express lease provisions that granted the preferential rents (*i.e.*, even when the lease expressly provided a preferential rent for a specified lease term);

    b)  limiting rent increases for MCIs and IAIs that were already under contract;

    c)  limiting the amount recoverable in a summary proceeding to the base rent and excluding fees, charges, or penalties, even when a lease expressly provides to the contrary;

    d)  destroying the benefit of the bargain for owners who contracted with the City to offer affordable housing units under the Article XI program and whose units have now been trapped under a permanent rent-regulation regime as a result; and

e)   rendering co-op/condo conversions impossible for owners who had already

entered into contracts to finance such conversions under the prior regime.

269.   By virtue of the amendments detailed above, the HSTPA has undermined the

bargains embodied in these contracts, interfered with the contracting parties' reasonable

expectations, and prevented landlord owners, including Plaintiffs, from safeguarding their rights.

270.   As discussed above, the HSTPA is untethered to any conceivable public purpose,

let alone a significant or legitimate purpose of the sort required to withstand constitutional

scrutiny under the contracts clause.

271.   Moreover, even if a legitimate public purpose existed, the HSTPA's provisions

impairing private contracts represent a wholly unreasonable—and, indeed, counterproductive—

means of achieving any such purpose.

272.   In the absence of declaratory and injunctive relief, landlord owners (including

Plaintiffs) will continue to be irreparably harmed and to be subjected to this deprivation of rights

guaranteed to them by the Constitution.

<u>**EIGHTH CAUSE OF ACTION**</u>
**Disparate Impact – Fair Housing Act, 42 U.S.C. §§ 3601 *et seq*.**
**(Against All Defendants Except the State)**

273.   Plaintiffs repeat and reallege each and every allegation of this Complaint as if

fully set forth herein.

274.   The FHA makes it unlawful to "make unavailable or deny[] a dwelling to any

person because of race, color, religion, sex, familial status, or national origin."  42 U.S.C.

§ 3604(a).

275.    As discussed above, rent-regulation has historically prevented the rental housing market from responding to market forces and has given preferential rental rates to those already living in rent-regulated housing units, thereby perpetuating housing segregation in New York.

276.    For example, because white renters enjoy a disproportionate discount on market rates compared to black and Hispanic renters, white renters are strongly incentivized to stay in housing units that otherwise would change hands and draw a more racially and ethnically diverse group of tenants.

277.    The HSTPA exacerbates these effects and thereby violates the FHA.  For instance, the repeal of the income cap *expands* the disproportionate advantages conferred upon affluent white tenants, allowing and incentivizing those tenants (and their family member successors) to remain in their rent-regulated apartments indefinitely.  In doing so, the HSTPA reduces housing opportunities for members of other racial and ethnic groups who want to compete in the rental market for those apartments.

278.    In these ways, the HSTPA not only fails at its purported goal of promoting affordable housing, but also disparately and adversely impacts racial and ethnic minority renters, perpetuates residential segregation in New York, and causes Plaintiffs significant harm by restricting their ability to make available residential housing that would be more integrated but for the new law's unprecedented and irrational expansion of the rent-regulation laws.

279.    Acting under color of state law, Defendants have caused, and will continue to cause, Plaintiffs to be subjected to this deprivation of rights guaranteed to them by federal law.

280.    In the absence of declaratory and injunctive relief, Plaintiffs will continue to be irreparably harmed by this deprivation of their rights.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in Plaintiffs'

favor and grant the following relief:

1) A declaration that the HSTPA is facially unconstitutional in its entirety because it
   violates:

   a) The takings clause of the Fifth Amendment to the U.S. Constitution, as incorporated
      against the States by the Fourteenth Amendment;

   b) The takings clause of Article I, § 7 of the New York State Constitution;

   c) The due process clause of the Fourteenth Amendment to the U.S. Constitution;

   d) The due process clause of Article I, § 6 of the New York State Constitution;

   e) The equal protection clause of the Fourteenth Amendment to the U.S. Constitution;

   f) The equal protection clause of Article I, § 11 of the New York State Constitution;
      and

   g) The contracts clause of Article I, § 10 of the U.S. Constitution;

2) A permanent injunction enjoining Defendants from enforcing the HSTPA as violative of
   each of the above-listed constitutional provisions;

3) In the alternative to Prayers (1) and (2):

   a) A declaration that each of the provisions of the HSTPA specifically challenged
      herein violates each of the above-listed constitutional provisions, and is therefore
      facially unconstitutional in its own right, including (but not limited to):

      • The restrictions on cooperative and condominium conversions;

      • The repeal of high-rent/high-income decontrol for rent-regulated units;

      • The repeal of high-rent vacancy decontrol for rent-regulated units;

      • The repeal of vacancy and longevity increases;

      • The restrictions on rent increases for Major Capital Improvements, including the
        retroactive application of the reduced cap on such increases;

      • The restrictions on rent increases for Individual Apartment Improvements;

- The restrictions on owners' rights to reclaim rent-regulated units for their own personal use and occupancy;

- The prohibition on increasing preferential rents to the full legal regulated rent upon lease renewal; and

- The imposition of onerous restrictions on evicting tenants who do not pay their rent;

b) A permanent injunction enjoining Defendants from enforcing each of the provisions of the HSTPA specifically challenged herein as violative of each of the above-listed constitutional provisions;

4) A declaration that the HSTPA is unconstitutional as applied to each Plaintiff because it violates each of the constitutional provisions listed in Prayer (1) above;

5) A permanent injunction enjoining Defendants from enforcing the HSTPA as against Plaintiffs' properties as violative of each of the above-listed constitutional provisions;

6) With respect to Plaintiffs' claims arising under the takings clauses of the Fifth Amendment to the U.S. Constitution and Article I, § 7 of the New York State Constitution, in the alternative to Prayer 5, an award of just compensation in amounts to be determined at trial, such amount being sufficient to make Plaintiffs whole by putting them in as good a position pecuniarily as if their property had not been taken;

7) In the alternative to Prayers (4) through (6):

a) A declaration that each of the provisions of the HSTPA specifically challenged herein violates each of the constitutional provisions listed in Prayer (1) above as applied to each Plaintiff;

b) A permanent injunction enjoining Defendants from enforcing each of the provisions of the HSTPA specifically challenged herein as applied to each Plaintiff;

c) With respect to Plaintiffs' claims arising under the takings clauses of the Fifth Amendment to the U.S. Constitution and Article I, § 7 of the New York State Constitution, in the alternative to Prayer 7(b), an award of just compensation in amounts to be determined at trial, such amount being sufficient to make Plaintiffs whole by putting them in as good a position pecuniarily as if their property had not been taken by each of the provisions of the HSTPA specifically challenged herein;

8) A declaration that the HSTPA is facially unlawful because it violates the FHA;

9) A permanent injunction enjoining Defendants from enforcing the HSTPA as violative of the FHA;

10) An award of fees, costs, expenses, and disbursements, including attorneys' fees and costs to which Plaintiffs are entitled pursuant to 42 U.S.C. §§ 1988 and 3613; and

11) Such other and further relief as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38, Plaintiffs demand a trial by jury in this action of all issues so triable.

Dated: New York, New York
       January 23, 2020

GIBSON, DUNN & CRUTCHER LLP

By:  /s/ *Randy M. Mastro*
     Randy M. Mastro
     Akiva Shapiro
     William J. Moccia

     200 Park Avenue, 47th Floor
     New York, NY  10166-0193
     Telephone:  (212) 351-4000
     RMastro@gibsondunn.com
     AShapiro@gibsondunn.com
     WMoccia@gibsondunn.com

     *Attorneys for Plaintiffs*